# Illinois Official Reports

## Appellate Court

---

*People v. Walker*, 2015 IL App (1st) 130500

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. ALONZO WALKER, Defendant-Appellant. |
| District & No. | First District, First Division<br>Docket No. 1-13-0500 |
| Filed<br>Rehearing denied | May 11, 2015<br>June 3, 2015 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 09-CR-5184; the Hon. Thomas V. Gainer, Jr., Judge, presiding. |
| Judgment | Affirmed; mittimus corrected. |
| Counsel on Appeal | Michael J. Pelletier, Alan D. Goldberg, and Jennifer L. Bontrager, all of State Appellate Defender's Office, of Chicago, for appellant.<br><br>Anita M. Alvarez, State's Attorney, of Chicago (Alan J. Spellberg, Carol L. Gaines, and Paul J. Connery, Assistant State's Attorneys, of counsel), for the People. |
| Panel | JUSTICE CUNNINGHAM delivered the judgment of the court, with opinion.<br>Presiding Justice Delort and Justice Harris concurred in the judgment and opinion. |

**OPINION**

¶ 1	Following a jury trial, defendant Alonzo Walker was convicted of first degree murder and sentenced to 42 years in prison. On appeal, defendant contends that because the jury was not asked to make any findings regarding his possession or discharge of a firearm, the trial court erred in imposing a 15-year firearm enhancement. Defendant further contends that the mittimus must be corrected to reflect the number of days he spent in presentence custody. For the reasons that follow, we affirm defendant's conviction and sentence and order correction of the mittimus.

¶ 2	Defendant's conviction arose from the February 14, 2009, shooting death of Al Brown. The State's theory of the case was that defendant, the victim, and James Pace attempted to rob Pace's drug supplier, but during the course of the unsuccessful robbery, the victim was shot and killed. Following arrest, defendant gave several video-recorded statements to the police. Defendant was charged by indictment with nine counts of first degree murder, one count of attempted armed robbery, two counts of aggravated unlawful use of a weapon (UUW), and one count of UUW by a felon. Eventually, the State agreed to sever the UUW charges and nol-prossed all other counts, save for one count of felony murder and one count of attempted armed robbery.

¶ 3	At trial, Chicago police officer Gerald Kush testified that about 11 p.m. on the night in question, he and his partner responded to a call of shots fired. As they drove in a grid pattern near the given location, Officer Kush saw a man, identified in court as defendant, running down an alley at a full sprint. Defendant got to the corner, saw the officers looking at him, and slowed to a walk. He then walked up to a house and rang the doorbell several times, but no one answered. When Officer Kush and his partner announced their office, defendant immediately jumped over a fence and fled. Officer Kush followed defendant in his squad car and his partner pursued defendant on foot. Eventually, Officer Kush saw that his partner had captured defendant and was hanging onto his ankle as he dangled over another fence. Officer Kush and his partner brought defendant down from the fence. In response to Officer Kush's question as to why he ran, defendant responded that he thought he had an outstanding warrant. The officers handcuffed defendant and placed him in the squad car. Officer Kush's partner searched the area and found a loaded Hi-Point 9-millimeter semiautomatic pistol just outside a gangway that defendant had run through. The police officer called out, "I got it" when he recovered the gun. At that point, defendant said, "That's not my gun. I mean I had it, but that's not my gun."

¶ 4	The gun was later recovered by an evidence technician, and two fingerprint analysts employed by the Illinois State Police testified that defendant's left thumbprint was found on the gun's magazine. A trace evidence analyst testified that defendant's hands tested negative for gunshot residue. The analyst stated that based on lab results, defendant may not have discharged a firearm or, if he did, then particles of gunshot residue were not deposited on his hands, were removed by activity, or were not detected by analysis.

¶ 5	Chicago police officer Conner testified that about 11 p.m. on the night in question, he and his partner responded to a call of shots fired. When they arrived at 2457 West Adams, they found the victim lying on the back porch, apparently dead from a gunshot wound. The medical examiner who performed the victim's autopsy testified that the victim suffered two gunshot wounds to the left side of his chest and that both bullets exited his body. The medical examiner concluded that the victim died of multiple gunshot wounds and the manner of death was

homicide. A forensic DNA analyst testified that DNA extracted from a swab of blood taken from defendant's shoe matched the victim's DNA.

¶ 6    Chicago police detective Carlos Cortez testified that he and several other detectives arrived at the scene sometime after 11 p.m. After observing the victim's body on the back porch, Detective Cortez and other officers entered the building through a basement window. In the basement, Detective Cortez saw a handgun on a bed and blood on the wall and railing of the stairwell to the first floor. He followed the trail of blood up the stairs to the kitchen and the back door. On the first floor, he observed blood on the front door. Through the front door was a vestibule, where Detective Cortez discovered blood on the door leading to the second-floor apartment. Detective Cortez knocked on the door, but when no one answered, he forced entry to the second-floor apartment. After confirming that there were no other victims in the two-flat, Detective Cortez returned to the basement to take note of evidence.

¶ 7    Detective Cortez testified that in the basement, he found a .38-caliber revolver, a brick of heroin, bullet holes in the walls, a bullet fragment, several fired cartridge casings, and a lease agreement signed by Michael Coleman. An evidence technician was called to assist with the recovery of evidence and to take photographs at the scene.

¶ 8    Forensic investigator/evidence technician Edwin Huels testified at length about photographing the scene and collecting evidence. In the first-floor living room, Huels observed blood on a door frame and a bullet hole in the wall just above and to the left of a couch. There was blood on the back door, as well as a blood trail leading from that door to the indoor basement stairwell, which was spattered with blood. In the basement, Huels noted bullet holes in the walls and ceiling. Evidence he recovered from the basement included four 9-millimeter Luger cartridge cases, a .45-caliber shell casing, a fired bullet, a bullet fragment, and a Colt Cobra .38-special revolver with four spent cartridge casings and two live rounds in the chamber. He also found a brick of heroin in a dresser drawer in a basement bedroom. In the separate upstairs apartment, he recovered six bags of heroin, a loaded .45-caliber Rock Island Armory semiautomatic pistol, and a loaded .40-caliber semiautomatic Glock pistol with an extended clip and two extra magazines. On a sidewalk outside the house, he recovered a fifth 9-millimeter Luger cartridge case.

¶ 9    Brian Parr, a forensic scientist specializing in firearms and tool mark identification, testified that he tested the guns, bullet and bullet fragment, and cartridge casings recovered by the police in the house, on the sidewalk, and in the gangway. He determined that the recovered bullet was fired from the .38-caliber Colt Cobra, the five 9-millimeter cartridge cases and a bullet jacket fragment were fired from the Hi-Point 9-millimeter semiautomatic pistol, the .45-caliber shell casing was fired from the .45-caliber Rock Island Armory semiautomatic pistol, and no evidence matched up with the .40-caliber semiautomatic Glock pistol.

¶ 10   Chicago police detectives David March, Roger Sandoval, and Gregory Jacobson and Assistant State's Attorney Robert Holland testified that they spoke with defendant on February 15 and 16, 2009, and that the interviews were videotaped. Recordings of the custodial interviews were presented to the jury.

¶ 11   In his first videotaped account of events, defendant stated that James Pace and a man he did not know picked him up on the night in question and the three of them drove around, drinking. Defendant stated that he did not know that Pace had a gun. Eventually, the group stopped at the house in question. Defendant waited in the car while Pace and the other man went inside, supposedly to get money that was owed to Pace. Defendant stated that the next thing he knew,

Pace and the other man came running out of the back of the house and defendant heard four or five shots. Pace jumped into the car and started driving through an alley. He then handed defendant a gun and told him to get out of the car. Defendant stated that he started walking through the alley. When he saw police officers, he walked up on a porch and rang a bell, but then fled as the officers approached. Defendant explained that he ran because he had a gun on him and because he thought he had a traffic warrant.

¶ 12 In his second account, defendant admitted that the third man with him and Pace was the victim, Al Brown. Defendant recounted that while driving around, the group stopped at Pace's mother's house. Pace went inside briefly and returned with two guns. Eventually, the group drove to the house in question. Defendant stated that he had taken Pace to the house in the past so that Pace could purchase drugs, but he said he had never been inside himself and did not know the supplier, "M.C." According to defendant, Pace and the victim went into the house while he stayed in the car in the alley with the radio turned up. A few minutes later, Pace ran out the back door, jumped in the car, and started driving. Pace told defendant that the men inside had tried to rob them and had shot the victim. Defendant took Pace's gun and walked off, intending to stop somewhere and call an ambulance for the victim.

¶ 13 Later in the interview, defendant stated that he went into the house with Pace and the victim, but that while Pace and the victim were armed, he was not. When they entered the house, two men were sitting on the couch, one with a pillow over his arm as if he was concealing something. A third man told Pace that he had "it" downstairs. Pace gave the victim money, and the victim accompanied the man to the basement. A few seconds later, defendant heard shots in the basement and then the victim yelled, "I'm hit. I'm hit." Defendant stated that Pace started shooting, dropped his gun, and ran out the door. Defendant picked up the gun, fired three times at the men on the couch, yelled to the victim to "come on," and ran to the alley.

¶ 14 After further questioning, defendant stated that when the victim went to the basement with the money, Pace gave defendant his gun. Then, after shots were fired in the basement, Pace fled from the house and the victim came running up the stairs, covered in blood. Defendant fired toward the men on the couch three to five times and ran from the house into the alley. Once outside, he fired his gun in the air two or three times.

¶ 15 In defendant's final account, he stated that Pace called him on the telephone and said that he had "a sting set up." That is, he wanted to rob his drug supplier, Michael Coleman, and asked defendant to find them a ride. While defendant was scrolling through his contacts, the victim happened to contact him and subsequently agreed to participate in the robbery. About half an hour later, the victim picked up defendant and the two drove to a fast-food restaurant to meet Pace.

¶ 16 The group drove to Pace's mother's house, where Pace retrieved two guns. Pace gave one of the guns to the victim and directed defendant to drive to Coleman's apartment. Pace's plan was to buy 250 grams of heroin from Coleman and then "rob him back for his money" and whatever other drugs and amounts of money were in the apartment. Pace would keep the drugs, and the group would split the money. Pace had $6,000 with him.

¶ 17 Defendant related that when the group entered Coleman's apartment, two men were sitting on a couch, watching television. One of the men had his hand underneath a pillow on his lap. A third man, who had answered the door, told Pace he would have to go to the basement for the drugs. When Pace refused, the victim took Pace's money and went downstairs. After about a

minute, Pace told defendant he was going downstairs to see what was going on. He handed defendant his gun, which defendant placed in his back pocket. When Pace got to the stairway, defendant heard a "pop" followed by two more shots. Pace turned and ran out the back door, and the victim came up the stairs, bleeding and saying he had been hit.

¶ 18    Defendant stated that in an effort to secure an exit for himself and the victim, he shot three times toward the men on the couch. He then ran out the back door, calling to Pace, who was driving away. Once defendant was outside, he fired a couple of shots into the air so that if anyone was in the area, they would stay away and not see him. Defendant then took off running down the alley.

¶ 19    Defendant did not testify at trial, and the defense did not present any evidence.

¶ 20    The jury found defendant guilty of both attempted armed robbery and first degree murder. The trial court entered judgment on the verdict and subsequently denied defendant's motion for a new trial.

¶ 21    At sentencing, the prosecutor argued that because the evidence showed defendant discharged a firearm during the commission of the offense, the trial court should include a 20-year firearm enhancement in the sentence. Defense counsel objected, noting that the State had not submitted a special verdict form to the jury on any firearm enhancement. The trial court imposed a 27-year sentence for first degree murder, plus 15 years for committing the offense while armed with a firearm–an enhancement it stated was "required by the statute"–for a total of 42 years' imprisonment. The trial court also imposed a concurrent eight-year sentence on the attempted armed robbery.

¶ 22    Defendant filed a motion to reconsider the sentence, arguing that no firearm enhancement was appropriate because defendant had been found guilty under a felony murder theory, not an accountability theory. Defendant also argued that the separate sentence for attempted armed robbery was improper. The trial court vacated the sentence for attempted armed robbery, but otherwise denied the motion. Defendant appeals.

¶ 23    On appeal, defendant contends that where the jury was not asked to make any findings regarding his possession or discharge of a firearm, the trial court erred in imposing the 15-year firearm enhancement. Defendant asserts that because the elements of felony murder and attempted armed robbery are not the same as the elements of the sentencing enhancements, there is no basis to find that the jury implicitly found the facts supporting either the "while armed with a firearm" enhancement or the "personally discharged a firearm" enhancement were proved beyond a reasonable doubt. Defendant argues that the imposition of the firearm enhancement was not statutorily authorized, and therefore, is void and must be vacated.

¶ 24    Because the issue presented concerns a question of law, our review is *de novo*. *People v. Hopkins*, 201 Ill. 2d 26, 36 (2002).

¶ 25    Here, the trial court imposed a 15-year firearm enhancement on defendant's sentence in accordance with section 5-8-1(a)(1)(d)(i) of the Unified Code of Corrections, which provides that if, during the commission of first degree murder, the defendant was "armed with a firearm," then "15 years shall be added to the term of imprisonment imposed by the court." 730 ILCS 5/5-8-1(a)(1)(d)(i) (West 2012). However, section 111-3(c-5) of the Code of Criminal Procedure of 1963 also provides:

    "[I]f an alleged fact (other than the fact of a prior conviction) is not an element of an offense but is sought to be used to increase the range of penalties for the offense beyond

the statutory maximum that could otherwise be imposed for the offense, the alleged fact must be included in the charging instrument or otherwise provided to the defendant through a written notification before trial, submitted to a trier of fact as an aggravating factor, and proved beyond a reasonable doubt." 725 ILCS 5/111-3(c-5) (West 2012).

See also *Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000) ("Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt.").

¶ 26    The fact at issue in the instant case–whether defendant was armed with a firearm–was not submitted to the jury as an aggravating factor for felony murder. Therefore, the trial court erred in imposing the 15-year firearm enhancement. See *People v. Edgecombe*, 2011 IL App (1st) 092690, ¶¶ 25-30.

¶ 27    Nevertheless, we find that the trial court's error was harmless. See *People v. Thurow*, 203 Ill. 2d 352, 368 (2003) (*Apprendi* violations are subject to harmless-error review); *People v. Rivera*, 227 Ill. 2d 1, 27 (2007) (same). An *Apprendi* error is harmless when it is clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error. *Thurow*, 203 Ill. 2d at 368-69. More specifically, the failure to instruct the jury on an element is harmless when the evidence in support of the omitted element is uncontested and overwhelming. *Thurow*, 203 Ill. 2d at 369.

¶ 28    In the instant case, the evidence at trial that defendant was armed with a firearm at the time he committed felony murder was uncontested and overwhelming. As noted by the State, the transcripts of defendant's statements to the police and the assistant State's Attorney include at least nine instances where defendant stated he not only possessed a gun during the attempted robbery that resulted in the victim's death, but also fired that gun inside and outside the apartment. In addition, when defendant was apprehended immediately following the shooting and a police officer found a gun nearby, defendant admitted to being in possession of that firearm. Defendant's thumbprint was found on the magazine of that gun, and cartridge casings fired from that gun were recovered inside and outside the apartment. This evidence was uncontested and overwhelming. Further, several times during closing argument, defense counsel referenced defendant's possession and discharge of a gun. Given the evidence presented at trial, it is clear beyond a reasonable doubt that a properly instructed, rational jury would have found that defendant possessed a gun while committing the crime charged. Accordingly, we conclude that the failure to instruct the jury as to this element was harmless error. *Thurow*, 203 Ill. 2d at 369, 371-72.

¶ 29    We are mindful of defendant's argument in his reply brief that "no harmlessness analysis is required" because the sentencing enhancement was not authorized and was therefore void. In support of this argument, defendant cites *Edgecombe*, 2011 IL App (1st) 092690, ¶¶ 26-28, 30, and *People v. Thompson*, 209 Ill. 2d 19, 23 (2004). We have reviewed the cited paragraphs of *Edgecombe* and find nothing discussing voidness or the application of harmless-error analysis to *Apprendi* violations. As for *Thompson*, in that case, the trial court imposed an extended-term sentence on a conviction for violation of an order of protection, even though the court was only authorized by statute to impose such a sentence on the most serious offense of which the defendant had been convicted, *i.e.*, aggravated battery. *Thompson*, 209 Ill. 2d at 21, 23. We held that the extended-term sentence was void because the trial court lacked statutory authority to impose an extended-term sentence on a conviction that was not the defendant's most serious offense. *Id.* at 24-25. Here, in contrast, the trial court had statutory authority to impose the

firearm enhancement, but simply erred in imposing it absent a finding from the jury that defendant possessed a firearm during the commission of the offense. *Thompson* is distinguishable, the 15-year firearm enhancement in the instant case is not void, and harmless-error analysis clearly applies.

¶ 30 Defendant's second contention on appeal is that the mittimus must be corrected to reflect credit for 1,419 days that he served in presentence custody. The State concedes that issue. Accordingly, we order the clerk of the circuit court to correct the mittimus to reflect 1,419 days of presentence custody credit.

¶ 31 For the reasons explained above, we affirm the judgment of the circuit court and order correction of the mittimus.

¶ 32 Affirmed; mittimus corrected.