2023 IL App (1st) 220376-U

FOURTH DIVISION
Order filed: September 28, 2023

No. 1-22-0376

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Respondent-Appellee, | ) | Cook County |
| | ) | |
| v. | ) | No. 09 CR 6853 01 |
| | ) | |
| TREMAINE MASON, | ) | Honorable |
| | ) | Stanley J. Sacks, |
| Petitioner-Appellant. | ) | Judge, Presiding. |

_____

JUSTICE HOFFMAN delivered the judgment of the court.
Presiding Justice Rochford and Justice Martin concurred in the judgment.

**ORDER**

¶ 1    *Held*: We affirmed the second-stage dismissal of the petitioner's claim of ineffective assistance on the part of his appellate counsel; reversed the second-stage dismissal of the petitioner's claim of ineffective assistance on the part of his trial counsel and remanded that claim to the trial court with instructions to advance the claim for a third-stage evidentiary hearing; and vacated the third-stage dismissal of the petitioner's actual innocence claim and remanded that claim to the trial court with instructions to conduct a third-stage evidentiary hearing on the claim, taking into consideration all the evidence.

¶ 2     The petitioner, Tremaine Mason, appeals from two orders of the circuit court addressed to his petition for relief brought pursuant to the Post-Conviction Hearing Act (Act) 725 ILCS 5/122 *et seq.* (West 2016). The first order, entered on January 27, 2021, granted the State's motion to dismiss the petitioner's claims of ineffective assistance of trial and appellate counsel following a second-stage proceeding under the Act. The second order, entered on February 24, 2022, denied the petitioner's actual innocence claim following a third-stage evidentiary hearing under the Act. For the reasons which follow, we: vacate the order of February 24, 2022, which denied the petitioner's claim of actual innocence; affirm that portion of the order of January 27, 2021, dismissing the petitioner's claim of ineffective assistance of appellate counsel; reverse that portion of the order of January 27, 2021, dismissing the petitioner's claims of ineffective assistance of trial counsel; and remand this matter to the circuit court with directions to both (1) advance the petitioner's claim of ineffective assistance of trial counsel for a third-stage evidentiary hearing and (2) consider the petitioner's actual innocence claim taking into consideration the trial record, the affidavits and other documentation submitted in support of the petition, and the testimony elicited at the November 10, 2021, third-stage evidentiary hearing on the petitioner' actual innocence claim.

¶ 3     In our decision disposing of the petitioner's direct appeal, this court recounted certain facts of this case relevant to that appeal. See *People v. Mason*, 2017 IL App (1st) 141199-U. We restate those facts supplemented with additional facts relevant to our disposition of this appeal.

¶ 4     As a result of the October 5, 2008, shooting of Sharron Wilkins and Allen Barber, the petitioner was charged by indictment with sixteen counts of first-degree murder, two counts of attempt first-degree murder, one count of aggravated battery with a firearm, and two counts of

aggravated discharge of a firearm. During petitioner's trial, the State introduced evidence that, on October 5, 2008, at approximately 4 p.m., the petitioner was driving a rented vehicle with three passengers when shots were fired from the vehicle at a group of individuals standing near 15th Street and South Christiana Avenue in Chicago. One of the individuals in the group, Wilkins, was shot in the head and thigh and died as a result of his wounds. Barber was injured as a result of the same shooting. The State's main witness, Sharron Winters, Wilkins's father, testified that he was sitting in his car waiting for his son when he observed the shooting and saw the petitioner, whom he identified in court, driving the vehicle used in the shooting. He stated that he got a "really good look" at the individuals in the car, and the driver looked directly at him. According to Winters, after the shooting stopped, and before the paramedics arrived, he crossed the street to find his son and was holding him when the ambulance came. Winters testified that he spoke to the police at the scene and gave a description of the vehicle from which the shots were fired and the direction it traveled following the shooting. On the day of the incident, however, Winters did not provide the police with a description of the individuals in the car. He stated that he followed the ambulance containing his son to the hospital.

¶ 5    Detective Raschke testified that he and his partner, Detective Crain, were assigned to the shooting on October 5, 2008. By the time that they arrived at the scene, Wilkins and Barber had already been transported to the hospital. While at the scene, they received information that a vehicle fitting the description of the car involved in the shooting had been found at 3645 West Polk Street. According to Detective Raschke, when they arrived at the Polk Street location, they observed a car with one of its windows shattered. Detective Raschke testified that he found juice bottles, cups, and clothing in the car. He also stated that he saw broken glass on the inside of the

car, a sweatshirt on the back seat, and spent shell casings. Detective Raschke testified that he learned that the vehicle had been rented by Lavonzell Coleman from Enterprise Rental and had been reported stolen at 6:40 p.m. that same day.

¶ 6 The parties stipulated that a latent fingerprint taken from a juice bottle found in the car was consistent with the petitioner's fingerprint. The parties also stipulate that a male DNA profile associated with the petitioner was identified from the cup found in the car.

¶ 7 On January 6, 2009, 93 days after his son was murdered, Winters gave Detectives Raschke and Crain a description of the driver of the car from which the shots were fired. Detective Raschke testified that Winters described the driver as a black male, 18–20 years old, and wearing braids. Winters did not remember if he described the driver as between 18 and 20 years of age and denied ever telling the detectives that the driver was wearing braids. On February 8, 2009, when shown a photo array, Winters identified the petitioner as the driver of the vehicle involved in the shooting.

¶ 8 Coleman testified that she had known the petitioner for about 20 years and that he was the father of her son. She stated that, on October 4, 2008, she rented a car for the petitioner from Enterprise Rental but did not list him as an authorized driver. According to Coleman, she received a phone call from the petitioner on the following day asking her to rent a different vehicle which she refused to do. Later that day, the petitioner called her again, and stated that the windows on the rental car had been "blown out." The petitioner told her to report the car stolen and not to go near it. Coleman testified that she went to the location where the petitioner told her that the car was located and saw police officers around the vehicle, after which she reported the car stolen.

¶ 9 Coleman admitted that she was interviewed by detectives and questioned about the vehicle that she rented for the petitioner. She was also interviewed by an Assistant State's Attorney who

- 4 -

took a written statement from her. Coleman stated that she identified the petitioner from a photo array and identified a picture of the vehicle that she had rented for him. Coleman acknowledged that she testified before the grand jury, and she identified her handwritten statement. According to Coleman, the petitioner weighed over 200 pounds in October 2008, and she had never known him to wear his hair in braids.

¶ 10    The parties stipulated that spent cartridge casings, bullet jackets, and bullets had been recovered from the scene of the shooting. Aaron Horn, a firearms identification expert, opined that, based on the items recovered, three firearms were used.

¶ 11    The petitioner testified that he was 29 years old, weighed 270 pounds, and was 5 feet and 11 inches tall. He stated that in October 2008, he wore his hair in a "short low" haircut and "bald." The petitioner testified that he had never worn braids. According to the petitioner, on October 4, 2008, he asked Coleman to rent a car for him because his "friends had just got shot and [he] was worried about the people who shot him knew [his] car. [He] felt like [he] was in danger." The petitioner testified that he lent the vehicle which Coleman rented for him to Dominique Evans so that Evans could visit his newborn daughter in the hospital. He stated that Evans picked up the vehicle from his house at approximately 12 p.m. on October 5, 2008. On cross-examination, the petitioner testified that he was at a friend's house when he gave Evans the car. He stated that Evans was supposed to call him and pick him up when he finished using the vehicle. The petitioner testified that, after receiving a call from Evans telling him that the rental car had been involved in a shooting and that it was parked near the intersection of Polk Street and Central Park Avenue, he called Coleman and told her to report the car stolen. He admitted that he told Coleman that the windows of the car had been "bust out" or shot out and that he told her where the vehicle could be

found. The petitioner admitted that, at some point, he had been in the car drinking from a juice bottle. He denied driving the car when Wilkins was shot or that he knew that the car was going to be used in a shooting. According to the petitioner, on October 5, 2008, Evans had "twists" in his hair and was 23 to 25 years old.

¶ 12     Following the petitioner's testimony, the defense rested. After arguments by counsel and instructions from the trial judge, the jury deliberated and found the petitioner guilty of first-degree murder.

¶ 13     On May 9, 2013, defense counsel informed the court that he had received a letter from the ARDC, stating that the petitioner had filed a complaint against him alleging ineffective assistance. The trial court indicated that it would conduct a preliminary hearing pursuant to *People v. Krankel*, 102 Ill. 2d 181 (1984). On July 12, 2013, the petitioner informed the court that he wished to proceed *pro se* and requested a continuance to prepare a motion for a new trial claiming ineffective assistance of counsel.   The trial court admonished the petitioner about proceeding *pro se* and explained to him what a *Krankel* inquiry entailed.

¶ 14     Although the petitioner never filed a motion alleging ineffective assistance of counsel, the trial court held a preliminary *Krankel* hearing on August 23, 2013. At that hearing, the petitioner appeared *pro se* and was afforded an opportunity to explain the reasons why he believed that he had received ineffective assistance of counsel. The trial court also heard testimony from the petitioner's mother, Belinda Mason, and defense counsel. At the conclusion of the hearing, the trial court found that "there is no credible evidence to establish even minimally that [defense counsel] *** was ineffective," and declined to appoint new counsel for the petitioner or to proceed

to a full evidentiary hearing. Subsequently, defense counsel argued a motion for a new trial which the trial court denied on February 14, 2014.

¶ 15    On April 9, 2014, the trial court sentenced the petitioner to 40 years' imprisonment: 25 years for first-degree murder with a 15-year firearm enhancement. The petitioner's motion to reconsider his sentence was denied.

¶ 16    The petitioner appealed, arguing that the trial court failed to conduct a proper preliminary *Krankel* inquiry into his allegations of ineffective assistance of trial counsel. He contended that the trial court failed to ascertain whether his trial counsel investigated evidence that corroborated his version of events. In addition, the petitioner argued that the trial court failed to award him the correct amount of presentence incarceration credit. On March 31, 2017, this court affirmed the judgment of the trial court and modified the sentencing order to reflect the number of days of presentence custody for which the petitioner is entitled to credit. See *People v. Mason,* 2017 IL App (1st) 141199-U.

¶ 17    On September 5, 2018, the petitioner, through private counsel, filed a petition for postconviction relief under the Act, raising claims of ineffective assistance of both trial and appellate counsel and a claim of actual innocence. Specifically, the petitioner alleged that his trial counsel rendered ineffective assistance by failing to: investigate and call several witnesses to testify; perfect the impeachment of Winters; introduce Coleman's grand jury testimony; present an expert witness to challenge the reliability of eyewitness testimony; act with reasonable promptness, thereby causing delays that prejudiced his defense; and promptly communicate and visit with him to discuss his case. The petitioner alleged that his appellate counsel rendered ineffective assistance by failing to raise a sufficiency-of-the-evidence argument on appeal and

failing to raise the propriety of the 15-year firearm sentencing enhancement. The petitioner also raised a claim of actual innocence based upon newly discovered evidence.

¶ 18    The petitioner supported his petition with: his own affidavit; the affidavit of Durrell Davis, a fellow inmate at Stateville Correctional Center; the affidavit of Barber; the affidavit of Patricia Hope, the mother of one of the petitioner's children; the affidavit of his mother, Belinda Mason (hereinafter referred to as Belinda); the affidavit of Shelia Rocquemore, the mother of another of the petitioner's children;  excerpts of the testimony of several witnesses, including Winters, who testified at the separate trials of the petitioner's co-defendants; copies of police reports; and Coleman's grand jury testimony.

¶ 19    The petitioner's affidavit states, *inter alia,* that his trial counsel only visited him three times while he was incarcerated prior to trial, and that during those visits, counsel never discussed his trial strategy. The petitioner alleged that, although trial counsel's associates also visited him in jail, they never went over anything of substance. The affidavit states that the petitioner told his trial counsel about his alibi when he saw him in court and on the three occasions that counsel visited him while he was incarcerated. It also states that his defense counsel smelled of alcohol at court appearances, including during trial. In the affidavit, the petitioner stated that his trial counsel originally told him that he should not testify, but on the day of trial, counsel told him that he would have to testify. According to the affidavit, trial counsel did not prepare the petitioner to testify and did not explain the questions that he might be asked by the prosecutor. In his affidavit, the petitioner stated that he asked his trial counsel if it would help to have an expert testify regarding eyewitness identification.

¶ 20    Davis's affidavit states that he was present when Wilkins was shot and that the driver of the vehicle from which the shots were fired was "real black with braids." According to his affidavit, Davis "got a real good look at the driver [of the vehicle]" and that he "knew *** [that the petitioner] didn't have anything to do with *** [Wilkins] being dead because he was not one of the guys I saw inside the gray car that day."

¶ 21    In his affidavit, Barber stated that he was "injured in the same shooting incident on October 5, 2008, that resulted in the death of Sharron Wilkins" and that he "knew that [the petitioner] was not involved in the shooting." According to his affidavit, Barber called the petitioner's attorney "and told him that [the petitioner] was not one of the people he saw in the car that shot him and killed *** [Wilkins]."

¶ 22    In her affidavit, Hope stated that she was with the petitioner on October 5, 2008, at approximately 10 or 10:30 a.m., when she heard "Fu" asked to use the rental car to go to the hospital to see his newborn child. She stated that "Fu" picked up the rental car later that same morning. The affidavit states that at 5:30 or 6:30 p.m. "Fu" was continually calling the petitioner, telling the petitioner to report the rental car stolen. According to her affidavit, Hope met with the petitioner's attorney who became angry when she tried to explain that she was there to tell him about the day of the shooting. The affidavit states that Hope smelled alcohol on the breath of petitioner's attorney.

¶ 23    Belinda's affidavit states that she took Hope to the office of the petitioner's attorney to discuss the petitioner's whereabouts on October 5, 2008. According to the affidavit, Belinda had previously told the petitioner's attorney that the petitioner was with Hope and "not present for the

shooting." She also stated that, when she went to petitioner's attorney's office with Hope, she smelled alcohol on the petitioner's attorney's breath.

¶ 24 In her affidavit, Rocquemore stated that the petitioner drove their daughter to school and picked her up on most days.

¶ 25 Also supporting the petitioner's postconviction petition was Coleman's grand jury testimony and the testimony of Winters, Detective Stewart and Officer Pietryla given at the trials of the petitioner's co-defendants.

¶ 26 The petition advanced to a second stage proceedings under the Act, and the State filed a motion to dismiss. On January 27, 2021, the trial court entered a written order granting the State's motion to dismiss the petitioner's claims of ineffective assistance of trial and appellate counsel. The trial court denied the State's motion to dismiss the petitioner's actual innocence claim, finding that, based upon the affidavit of Davis, the petitioner made "a substantial showing of a constitutional violation," entitling him to an evidentiary hearing on the claim.

¶ 27 On November 10, 2021, the trial court held a third-stage evidentiary hearing on the petitioner' actual innocence claim. During that hearing, Davis testified to the matters contained in his affidavit. Davis stated that he was an inmate at the Stateville Correctional Center, serving a life sentence for murder. He testified that he was present when Wilkins and Barber were shot. He stated that he saw three people in the car from which shots were fired: the driver, a front seat passenger, and a rear seat passenger. The passengers were shooting, but not the driver. Davis described the driver of the vehicle as "real dark skinned, with braids, and he looked young." According to Davis, he was one "hundred percent" certain that the petitioner was not the driver. Davis stated that he observed the driver for about three seconds. He identified the petitioner during the hearing and

stated that he was not one of the individuals in the car. According to Davis, when the shooting started, he "took off running." When the shooting stopped, he returned and saw Wilkins and Barber lying on the ground. Davis testified that Winters did not arrive on the scene until after the ambulance arrived. He stated that, when Winters arrived on the scene, he asked him what had happened. Davis spoke to Winters for about 5 minutes before Winters left the scene. Davis testified that, after speaking with Winters, he left the scene without talking to the police because he was "dealing with *** [his] own issues." He stated that he had been charged with murder and was out on bond and "didn't want to have nothing to do with anything that was going on *** [and] just left." Davis stated that he did not know the petitioner before he met him in prison. He testified that, in April 2016, he was walking through the prison dining room when another inmate pointed out the petitioner as "one of the guys that's locked up for shooting [Wilkins]." Davis stated that he told the other inmate that "[h]e couldn't be one of the guys that shot *** [Wilkins]. I seen the individuals who shot *** [Wilkins]." Davis testified that, when he first approached the petitioner, the petitioner was reluctant to talk with him about the case. About three months after their initial meeting, the petitioner did agree to speak with him about the matter. Davis stated that he told the petitioner that he witnessed the shooting and would be willing to sign an affidavit attesting to what he had seen and that he did not see the petitioner driving the car from which the shots were fired.

¶ 28    Following Davis's testimony both sides rested. The trial court continued the matter to December 6, 2021, for argument. On December 6, neither petitioner's counsel nor counsel for the State appeared in court. The matter was continued to December 22, 2021, but before that date, petitioner's counsel appeared and informed the trial court that she would be unavailable on December 22.

¶ 29     On February 24, 2022, following arguments by counsel, the trial court denied the petitioner postconviction relief based on a claim of actual innocence. The record contains a handwritten half-sheet order which states, "relief denied." The record also contains a transcript of the proceedings on February 24, 2022, in which the trial court recounted certain of the evidence from the petitioner's trial and the reasons for its finding that Davis "had no credibility whatsoever." The trial court noted the discrepancy between Davis's testimony that there were three individuals in the car from which shots were fired at the group of individuals that included Wilkins and the trial evidence that there were four individuals in the car. The trial court also commented on the circumstance of Davis's encounter with the petitioner in prison six years after Wilkins was shot and his revelation for the first time that he had witnessed the shooting. The trial court stated that "the only evidence before me on a motion of actual innocence on this case is based on Durrell Davis, and I don't believe him at all." The trial court denied the petitioner's actual innocence claim, again stating: "I don't find Durrell Davis credible at all."

¶ 30     The petitioner now appeals from both the trial court's order of January 27, 2021, granting the State's motion to dismiss his petition for postconviction relief based on claims of ineffective assistance of trial and appellate counsel, and the trial court's order of February 24, 2022, denying his petition for postconviction relief based on a claim of actual innocence. We address first the order of January 27, 2021, entered at the second stage of the postconviction proceeding.

¶ 31     The Act provides a three-stage procedure by which defendants can assert a substantial denial of their rights under either the federal or state constitution. See 725 ILCS 5/122-1 *et seq.* (West 2016). Petitions that are not summarily dismissed at first-stage proceedings advance to the second stage, where counsel is appointed to "shape the petitioner's claims into the appropriate legal form." *People v. Turner*, 187 Ill. 2d 406, 417 (1999). At this stage of postconviction

proceedings, the State is required to either answer the petition or move to dismiss it. When, as in this case, the State moves to dismiss the petition, all well-pleaded factual allegations in the petition and any supporting documentation not positively rebutted by the record must be taken as true. *People v. Sanders,* 2016 IL 118123, ¶ 42. Credibility is not an issue at the second stage of postconviction proceedings. *Id.* Issues that were raised and decided on direct appeal are barred from consideration under the doctrine of *res judicata*; issues that could have been raised on direct appeal, but were not, are forfeited. *People v. Holman,* 2017 IL 120655, ¶ 25.

¶ 32    At the second stage of postconviction proceedings, the trial court is tasked with reviewing the petition and supporting documentation to determine if the factual allegations, taken as true and liberally construed in favor of the petitioner, make a substantial showing of a violation of the petitioner's constitutional rights. *People v. Mitchell*, 189 Ill. 2d 312, 322 (2000).  The question raised on appeal from a second-stage dismissal of a postconviction petition is whether the petition and supporting documentation, taken as true and liberally construed in favor of the petitioner, are sufficient to invoke relief under the Act. *Sanders,* 2016 IL 118123, ¶ 31. The question is one of law, and our review is, therefore, *de novo. Id.*

¶ 33    Claims of ineffective assistance of counsel are judged under the standard established by the Supreme Court in *Strickland v. Washington,* 466 U.S. 668, 687 (1984). *People v. Coleman*, 183 Ill. 2d 366, 397 (1998). In advancing such a claim, the petitioner must make a substantial showing that his counsel's performance was deficient. *Id*. In so doing, the petitioner must overcome the strong presumption that the challenged action or inaction was the product of sound trial strategy. *Id.* The petitioner must also demonstrate that, but for counsel's deficient

performance, the result of the proceeding would have been different. *Id.* Failure to satisfy either prong precludes a finding of ineffective assistance. *Id.*

¶ 34　The petitioner argues that the trial court erred in dismissing his claims of ineffective assistance of trial counsel because his petition and supporting documentation made a substantial showing of a constitutional violation. In support of the argument, the petitioner references a number of examples of action, or inaction, on the part of his trial counsel that constituted ineffective assistance. We will address each of the petitioner's contentions of ineffective assistance, but not necessarily in the order in which they are presented in the petitioner's brief.

¶ 35　The petitioner contends that his trial counsel was ineffective by failing to: cross-examine Coleman with the content of her grand jury testimony and introduce that testimony into evidence; act with reasonable promptness, thereby causing delays that prejudiced his defense; promptly communicate and visit with him to discuss his case; and prepare him to testify. Clearly, these facts were known by the petitioner when he filed his direct appeal. As the trial court correctly found, these arguments were either raised, or could have been raised, in the petitioner's direct appeal. As a consequence, the claims are barred by the doctrines of *res judicata* and forfeiture. See *Holman,* 2017 IL 120655, ¶ 25.

¶ 36　The petitioner also contends that his trial counsel rendered ineffective assistance when he was absent during jury deliberations. However, that contention was made by the petitioner at the time of his preliminary *Krankel* hearing and was known by him at the time of his direct appeal. The contention is also barred by the doctrines of *res judicata* and forfeiture. See *id.*

¶ 37　The petitioner contends that his trial counsel rendered ineffective assistance by failing to present an expert witness to challenge the reliability of eyewitness testimony. In his affidavit,

however, the petitioner stated that he asked his trial counsel if it would help to have an expert testify regarding eyewitness identification. The fact that no expert was called was known to the petitioner and could have been raised on direct appeal, but was not. The contention is forfeited. See *id.* Forfeiture aside, the failure of counsel to engage and call an expert to testify as to the reliability of eyewitness identification under the circumstances present at the time of the petitioner's trial was a matter of strategy left to counsel's discretion. As the State points out, the petitioner's trial took place in March 2013 at a time when testimony regarding the reliability of eyewitness identification testimony was routinely excluded. See *People v. Macklin*, 2019 IL App (1st) 161165, ¶ 38; see also *People v. Enis*, 139 Ill. 2d 264, 286–87 (1990). Trial counsel could hardly be found to have rendered ineffective assistance for failing to call an expert witness whose testimony would have been excluded.

¶ 38    In his petition for postconviction relief, the petitioner asserted that his trial counsel rendered ineffective assistance by failing to call Officer Pietryla, who could have testified that he never spoke with Winters at the scene of the shooting or at the hospital where Wilkins was taken by ambulance. The contention is based upon testimony given by the officer at a subsequent trial of the petitioner's codefendants. But, as the circuit court found, trial counsel can hardly be faulted for having failed to divine what Officer Pietryla would say at some future date.

¶ 39    The petitioner asserted that his trial counsel was ineffective by failing to call Hope to testify to his whereabouts at the time of the shooting and to corroborate his testimony that he lent the rental vehicle that was used in the shooting to a friend who later called and told him to report the car stolen. These arguments were either raised, or could have been raised, in the petitioner's

direct appeal are, therefore, barred by the doctrines of *res judicata* and forfeiture. See *Holman*, 2017 IL 120655, ¶ 25.

¶ 40     In passing, the petitioner alleged that his counsel was ineffective for failing to call Rocquemore as a witness. However, as the State correctly argues, the facts alleged in Rocquemore's affidavit are in no way exculpatory as they do not address the petitioner's activities on the date of Wilkins's murder. Generally, the decision as to which witnesses to call is a matter of trial strategy that rests with counsel and will not support a claim of ineffective assistance. See *People v. Clendenin*, 238 Ill. 2d 302, 318–19 (2010). A claim of ineffective assistance of counsel cannot be predicated upon a matter of defense strategy unless the strategy was unsound. *People v. Ramey*, 152 Ill. 2d 41, 54 (1992). To prevail on a claim of ineffective assistance of counsel, a defendant must demonstrate both that counsel's performance was objectively unreasonable and that he was prejudiced. *People v. Veach,* 2017 IL 120649, ¶ 30. Prejudice is a reasonable probability that, but for counsel's deficient performance, the results of the proceeding would have been different. *Id.* Based upon the content of her affidavit, we are at a loss to understand how the failure to call Rocquemore as a witness constituted deficient performance or resulted in prejudice to the petitioner.

¶ 41     The petitioner also alleged that his attorney rendered ineffective assistance by failing to call Detective Stewart to testify. He contends that Detective Stewart would have testified, as he did at the trial of one of the codefendants, that he interviewed two juveniles who claimed to have witnessed two individuals with braids abandoning the vehicle used by the assailants. He also contends that counsel was ineffective by failing to investigate and call the two juveniles as witnesses. According to the petitioner, their testimony would have corroborated his testimony that

he never wore his hair in braids. The trial court found that the evidence would have been of little value because the witnesses lied about their age. The trial court's finding in this regard was a credibility determination that is inappropriate at the second stage of a postconviction proceeding. See *People v. Sanders,* 2016 IL 118123, ¶ 45. However, Winters, the only eyewitness to testify at the petitioner's trial, testified that the driver of the assailant's vehicle wore his hair in braids. There was no testimony that the driver wore his hair in anything other than braids. The testimony of Detective Stewart and the two juveniles would merely have been cumulative of an undisputed issue. As such, the petition failed to overcome the presumption that counsel's decision as to which individuals to call was a matter of trial strategy, which will not support a claim of ineffective assistance. See *People v. Patterson,* 217 Ill. 2d 407, 441 (2005).

¶ 42 However, there are several of the petitioner's allegations of ineffective assistance of counsel that merit closer scrutiny. In his affidavit, Barber, who was shot during the same incident on October 5, 2008, that resulted in the death of Wilkins, stated that he called the petitioner's attorney "and told him that [the petitioner] was not one of the people he saw in the car that shot him and killed *** [Wilkins]" and that he "knew that [the petitioner] was not involved in the shooting." The petition alleged that the petitioner's counsel never interviewed Barber or called him to testify. When ruling on the State's motion to dismiss, the trial court found that "[a]lthough Barber's testimony may have been exculpatory, it could have been substantially impeached." It again appears that in so ruling, the trial court made a credibility determination that was inappropriate at the second stage of a postconviction proceeding. See *People v. Sanders,* 2016 IL 118123, ¶ 45.

¶ 43    Taking the factual allegations in the petition and Barber's affidavit as true, we can discern no valid trial strategy that would justify trial counsel's failing to interview Barber or call him to testify. Failure on the part of an attorney to investigate or call a witness in support of an otherwise uncorroborated defense can form the basis of an ineffective assistance claim. *People v. Skinner,* 220 Ill. App. 3d 479, 485 (1991).

¶ 44    The petitioner also alleged that his trial counsel was ineffective for failing to impeach Winters, the State's only witness to identify him as the driver of the vehicle from which the fatal shots were fired, with inconsistencies between his testimony at the petitioner's trial and his testimony at the trials of his codefendants and was ineffective for failing to raise those inconsistencies in a post-trial motion. The petitioner identified inconsistencies relating to weather conditions on the day of the shooting, the time that elapsed between the first shots that were fired and when the assailants fled the scene, the distance between Winters's car and the assailants' vehicle when the shooting began, the location where Winters was parked as he witnessed the shooting, and whether he told his wife on the date of the shooting that he was a witness. The trial court found that defense counsel cannot be faulted for failing to impeach Winters at the petitioner's trial with inconsistent statements that he made at the subsequent trials of his co-defendants. We agree, but the petitioner also alleged that defense counsel was ineffective for failing to raise Winters's inconsistent testimony in his post-trial motions. The trials of the codefendants took place in June and September of 2013. Although the petitioner's trial ended on March 15, 2013, his post-trial motion for a new trial was not heard until February 10, 2014. The motion for a new trial filed on behalf of the petitioner failed to reference the inconsistencies between Winters's testimony at the petitioner's trial and his testimony at the trials of his co-defendants. As the petitioner correctly

argues, the failure of counsel to raise a specific issue in a post-trial motion may form the basis of an ineffective assistance of counsel claim where it is demonstrated that the failure to address the issue affected the defendant's conviction. See *People v. Peco,* 345 Ill. App. 3d 724, 729 (2004). In this case, Winters was the only witness to identify the petitioner as the driver of the vehicle from which the shots that resulted in the death of Wilkins were fired. Evidence of inconsistent testimony that would have called into question Winters's identification testimony may well have affected the petitioner's conviction and his motion for a new trial. We conclude, therefore, that the petitioner's allegation that his defense attorney failed to investigate Winters's testimony at the trial of his codefendants and his failure to raise his inconsistencies in a post-trial motion made a substantial showing of ineffective assistance of counsel.

¶ 45    Based on the allegations in the petition for postconviction relief addressing defense counsel's failure to investigate and call Barber to testify and his failure to include the inconsistencies in Winters's testimony in a post-trial motion, we conclude that the petitioner made a substantial showing of ineffective assistance of trial counsel that should have been advanced for a third-stage evidentiary proceeding.

¶ 46    The petitioner next argues that the trial court erred in dismissing his claim of ineffective assistance of appellate counsel based on counsel's failure to raise on direct appeal the sufficiency of the evidence and by failing to challenge the imposition of the 15-year firearms enhancement as part of his sentence. On the issue of appellate counsel's failure to challenge the sufficiency of the evidence, the trial court found that such a challenge would have been meritless. As to the claim that appellate counsel was ineffective for failing to challenge the imposition of the 15-year firearms enhancement as part of the petitioner's sentence, the trial court found that failing to submit the

question of whether Wilkins's murder was committed with a firearm to the jury constituted harmless error as the evidence was uncontested that Wilkins's murder was committed with a firearm. Consequently, the court reasoned, any challenge to the firearm enhancement would have failed on appeal and appellate counsel was "not even arguably deficient for failing to raise it." We agree with both findings.

¶ 47    The standard of review on a challenge to the sufficiency of the evidence is whether, viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *People v. Belknap*, 2014 IL 117094, ¶ 67. "A single witness' identification of the accused is sufficient to sustain a conviction if the witness viewed the accused under circumstances permitting a positive identification." *People v. Slim*, 127 Ill. 2d 302, 307 (1989). Winters's identification of the petitioner as the driver of the vehicle from which the shots that killed Wilkins were fired, when viewed in its light most favorable to the State, was sufficient to sustain the petitioner's conviction. A defendant who alleges ineffective assistance of appellate counsel "must establish both a deficiency in counsel's performance and prejudice resulting from the asserted deficiency." *People v. Edwards*, 195 Ill. 2d 142, 163 (2001). Appellate counsel is not required to brief every conceivable issue on appeal, and it is not incompetence for counsel to refrain from raising meritless issues. *Id.* at 163–64. Any challenge to the sufficiency of the evidence on direct appeal in this case would have been meritless, and as a consequence, the petitioner cannot establish that appellate counsel rendered ineffective assistance by failing to raise the argument.

¶ 48    In his postconviction petition, the petitioner also asserted that his appellate counsel rendered ineffective assistance by failing to challenge on direct appeal the imposition of a 15-year firearms enhancement as part of his sentence when the issue of whether Wilkins's murder was

committed with a firearm was not submitted to the jury. It is true, as the State acknowledges, that any issue that increases the penalty for a crime, other than a prior conviction, must be submitted to the jury and proven beyond a reasonable doubt. See *Apprendi v. New Jersey,* 530 U.S. 466, 490 (2000). However, *Apprendi* violations are subject to harmless error review. See *People v. Thurow*, 203 Ill. 2d 352, 368 (2003). An *Apprendi* violation is harmless when the evidence of the omitted element is uncontested and overwhelming. *People v. Walker*, 2015 IL App (1st) 130500, ¶ 27.  In this case, the trial evidence that Wilkins died as the result of a gunshot was uncontested and overwhelming. Any claim of error on direct appeal based on the failure to submit the issue of whether Wilkins's murder was committed with a firearm and the imposition of a 15-year firearms enhancement as part of the petitioner's sentence would have been rejected as harmless error. *Id.* ¶ 28. For this reason, we find that the petitioner has not, and could not, establish that appellate counsel rendered ineffective assistance by failing to raise the argument.

¶ 49    We conclude that the trial court correctly dismissed the petitioner's claim of ineffective assistance on the part of his appellate counsel on direct appeal at the second stage of postconviction proceedings.

¶ 50    Next, we address the petitioner's argument that the trial court's denial of his actual innocence claim following an evidentiary hearing was manifestly erroneous. The petitioner argues that, in denying his actual innocence claim, the trial court did not consider all of the evidence supporting the claim.

¶ 51    When, as in this case, a postconviction claim survives dismissal at the second stage of proceedings under the Act, the matter then advances to the third stage, where an evidentiary hearing is held to establish the truth of the petition's factual allegations. 725 ILCS 5/122-6 (West 2020); *People v. Pendleton*, 223 Ill. 2d 458, 473 (2006). The court may receive proof by affidavits,

depositions, oral testimony, or other evidence and may order the petitioner to be brought before the court. 725 ILCS 5/122-6 (West 2020).

¶ 52    At a third-stage evidentiary hearing, the trial court acts as a fact finder and determines the credibility of the witnesses and the weight to be given to their testimony and resolves any conflicts in the testimony. *People v. Domagala*, 2013 IL 113688, ¶ 34. We review the trial court's decision to deny postconviction relief following an evidentiary hearing for manifest error. *People v. Coleman*, 2013 IL 113307, ¶ 98. "[A] decision is manifestly erroneous when the opposite conclusion is clearly evident." *Id.* This standard of review "recognizes that 'we must give great deference to the trial court's factual findings because the trial court stands in the best position to weigh the testimony of the witnesses' " who testify at a third-stage evidentiary hearing. *People v. Hotwagner*, 2015 IL App (5th) 130525, ¶ 31 (quoting *In re Floyd*, 274 Ill. App. 3d 855, 867 (1995)).

¶ 53    To succeed on a postconviction claim of actual innocence, a petitioner must present new, material, and noncumulative evidence that is so conclusive that it would probably change the result on retrial. *People v. Robinson*, 2020 IL 123849, ¶ 47; *People v. Edwards*, 2012 IL 111711, ¶ 32; *Coleman*, 2013 IL 113307, ¶ 96. Newly discovered evidence is evidence which was discovered after trial and could not have been discovered by the petitioner earlier through the exercise of diligence. *Robinson*, 2020 IL 123849, ¶ 47; *Coleman*, 2013 IL 113307, ¶ 96. Evidence is material if it is relevant and probative of the petitioner's innocence. *Robinson*, 2020 IL 123849, ¶ 47. Noncumulative means that the evidence adds to the information that the fact finder heard at trial. *Id.* Conclusive means that the evidence, when considered along with the trial evidence, would probably lead to a different result. *Id.; People v. Ortiz*, 235 Ill. 2d 319, 336–37 (2009). When

determining whether evidence of actual innocence is conclusive, "the trial court *** must consider whether that evidence places the evidence presented at trial in a different light and undercuts the court's confidence in the factual correctness of the guilty verdict." *Coleman*, 2013 IL 113307, ¶ 97. Resolution of the issue "involves credibility determinations that are uniquely appropriate for trial judges to make." *Id.* "The conclusive character of the new evidence is the most important element of an actual innocence claim." *Robinson*, 2020 IL 123849, ¶ 47.

¶ 54    In his postconviction petition, the petitioner asserted that Davis's affidavit, when taken with the affidavit of Barber, established "a strong probability of a changed result on retrial." The State argues that the trial court properly denied the actual innocence claim after finding that Davis "had no credibility whatsoever." It also argues that Barber's affidavit was submitted in support of the petitioner's ineffective assistance of counsel claim, not his actual innocence claim, and, therefore, cannot be relied on to support his freestanding claim of actual innocence.

¶ 55    In this case, Davis's averments were clearly newly discovered, material, and noncumulative. However, on the issue of the conclusiveness of his testimony, the trial court found Davis's testimony to be lacking in credibility and articulated its reasons for so finding. The trial court noted the discrepancy between Davis's testimony as to the number of individuals in the car from which the shots that killed Wilkins were fired and the trial testimony as to the number of individuals in the car. The trial court also commented skeptically on the circumstance of Davis's encounter with the petitioner in prison six years after Wilkins was shot and his revelation for the first time that he had witnessed the shooting. We give great deference to a trial court's findings as to credibility and the weight to be given to a witness's testimony. *Domagala*, 2013 IL 113688, ¶ 34; *Hotwagner*, 2015 IL App (5th) 130525, ¶ 31. Taken in isolation, we find no error in the trial court's determination that Davis lacked credibility.

¶ 56    As the petitioner argues, however, in resolving a claim of actual innocence, the trial court in effect predicts what a jury would likely do on a retrial, "considering all the evidence, both new and old, together." *Coleman*, 2013 IL 113307, ¶ 97. In this case, the trial court stated: "So the only evidence before me on a motion of actual innocence on this case is based on Durrell Davis and I don't believe him at all." Although the record reflects that the trial court also considered the evidence presented at the petitioner's trial, there is no indication that the trial court ever considered Barber's affidavit in ruling on the petitioner's actual innocence claim. Barber was shot during the same incident on October 5, 2008, that resulted in the death of Wilkins, and stated in his affidavit that the petitioner was not involved in the shooting. We believe that the State is incorrect when it contends that Barber's affidavit cannot be considered in support of the petitioner's claim of actual innocence because it was used in support of the claim of ineffective assistance of counsel. In *People v. Martinez*, 2021 IL App (1st) 190490, this court held that, although freestanding claims of actual innocence are independent of constitutional claims of error at trial, the evidence supporting a petitioner's claim of actual innocence need not be independent of the evidence underlying his other constitutional claims or trial error. *Id.* at 104. We find no reason to deviate from that holding.

¶ 57    Because the record supports the petitioner's assertion that the trial court did not consider Barber's affidavit when ruling on his actual innocence claim, we believe that the appropriate course is to vacate the denial of the actual innocence claim and remand the matter to the trial court with directions to conduct a third-stage evidentiary hearing on the claim, taking into consideration all the evidence, both new and old, together.

¶ 58    Lastly, the petitioner argues that, on remand, this matter should be assigned to a different judge. He contends that the conduct of the trial judge is evidence of animosity toward him and his

attorney, "as well as the prejudicing of the issues." Nothing in the transcript of proceedings supports the assertion that the trial judge prejudiced the issues. It is true that the trial judge personally questioned Davis during the evidentiary hearing, but questioning a witness to test his veracity does not rise to the level of prejudging the issue. On the assertion that the trial judge exhibited animosity toward him and his attorney, the petitioner points to a passage in the transcript where the trial court reproached his attorney for referring to an argument made by the Assistant States Attorney as "absolutely absurd." We do not view commenting on incivility as evidence of animosity. The petitioner also points to an exchange in the transcript where the trial judge registered his displeasure with the fact that neither counsel appeared at a scheduled court date. The trial judge related that he had spent a weekend preparing for a hearing, but neither the petitioner's attorney nor the Assistant States Attorney appeared. We read the trial judge's comments as evidence of frustration, not animosity. We decline to order this matter assigned to a different judge.

¶ 59    In summary, we: affirm the second-stage dismissal of the petitioner's claim of ineffective assistance on the part of his appellate counsel; reverse the second-stage dismissal of the petitioner's claim of ineffective assistance on the part of his trial counsel and remand that claim to the trial court with instructions to advance the claim for a third-stage evidentiary hearing; and vacate the third-stage dismissal of the petitioner's actual innocence claim and remand that claim to the trial court with instructions to conduct a third-stage evidentiary hearing on the claim, taking into consideration all the evidence, both new and old, together.

¶ 60    Affirmed in part, vacated in part, reversed in part, and remanded with directions.