NOTICE
Decision filed 08/12/25. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2025 IL App (5th) 220788-U

NO. 5-22-0788

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | St. Clair County. |
| | ) | |
| v. | ) | No. 21-CF-1435 |
| | ) | |
| DEANGELO HIGGS, | ) | Honorable |
| | ) | L. Dominic Kujawa Jr., |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE MOORE delivered the judgment of the court.
Presiding Justice McHaney* and Justice Cates concurred in the judgment.

**ORDER**

¶ 1    *Held*: Defendant's convictions are affirmed. Defendant's claim of ineffective assistance is without merit. The defendant's sentence is reduced pursuant to Ill. S. Ct. R. 615(b)(4) to comply with the statutory cap on consecutive sentences.

¶ 2    The defendant, Deangelo Higgs, appeals his convictions and sentences, following a jury trial in the circuit court of St. Clair County, for seven counts of attempted first degree murder and one count of unlawful possession of a weapon by a felon. For the reasons that follow, we affirm the defendant's convictions and reduce his sentence from 182 years to 120 years' imprisonment to comply with the statutory cap on aggregate maximum consecutive sentences pursuant to section 5-8-4(f)(2) of the Unified Code of Corrections (Code) (730 ILCS 5/5-8-4(f)(2) (West 2020)).

_____

*Justice Welch participated in oral argument. Presiding Justice McHaney was later substituted on the panel and has read the briefs and listened to the recording of oral argument.

1

## I. BACKGROUND

### A. *Indictment*

We recite only those facts necessary for an understanding of our disposition of this appeal. On September 24, 2021, the defendant was indicted by a grand jury with a total of 16 counts. Specifically, the defendant was indicted with seven counts of attempted first degree murder. Each alleged that on September 9, 2021, the defendant, or one for whom he was accountable, without justification, shot a named individual with intent to kill that individual: respectively, Marquise Chairs, Trequion Holman, Camelita Lacroix, David Whitfield, Mark Williams, Jimmie Nicholson, and a juvenile, M.M. In addition, the defendant was indicted on seven counts of aggravated battery with a firearm as to the same individuals, as well as one count of aggravated battery of a child as to M.M. and one count of unlawful possession of a weapon by a felon. All counts were Class X felonies except the possession of a weapon by a felon, which was a Class 2 felony. Each count of attempted murder and aggravated battery named Cartez Beard and Lorenzo Bruce as codefendants.

### B. *Waiver of Counsel*

On April 22, 2022, the defendant filed a *pro se* motion entitled, "Motion to Withdraw Counsel," wherein he alleged that he and his "attorney have had a number of disagreements which render further representation impossible." On the same date, the defendant filed a *pro se* "Demand for Speedy Trial." On May 4, 2022, the defendant appeared before the trial court and indicated that he no longer wanted the public defender to represent him and that he would like to proceed *pro se*. The defendant stated to the trial court, "With all due respect, I've already made the decision. I unequivocally would like to represent myself. There is no need for second thought about it." With agreement from the defendant, the trial court continued his request to proceed *pro se* to May 17,

2022, to give the defendant time to "really think about this." On May 17, 2022, the following

colloquy took place between the defendant and the trial court:

> "THE COURT: I know we were here a week or so ago, maybe two weeks ago, Mr. Higgs.
> THE DEFENDANT: Yes, sir, Your Honor.
> THE COURT: And I think at that time you stated that you wanted to represent yourself in this matter. Correct.
> THE DEFENDANT: Yes, sir, Your Honor.
> THE COURT: What—do you remember what I said to you?
> THE DEFENDANT: You gave me some time to think about it.
> THE COURT: All right. Now, I gave you some time to think about it. Do you still want to go down that route?
> THE DEFENDANT: Yes, sir, Your Honor.
> THE COURT: All right. Well, I'm going to go over some things with you, and then I'm going to ask you again if you still want to go down that route, so I want you to listen real close to me.
> THE DEFENDANT: Yes, sir.
> THE COURT: All right. Looking at the charges, I have a sixteen-count—sixteen counts in front of me; seven of them being aggravated battery, discharge of a firearm; Count 8, unlawful possession of a weapon by a felon; 9 through 15, attempted first degree murder; Count 16, aggravated battery of a child.
> All of these—all of these are Class X felonies, punishable by six to thirty years Department of Corrections, up to three years of mandatory-supervised release.
> At this time, I—I don't know if they run consecutively or not, meaning boom boom boom (indicating). Do you understand that, Mr. Higgs?
> THE DEFENDANT: Yes, sir.
> THE COURT: Do you understand what I mean by that?
> THE DEFENDANT: Yes, sir, Your Honor.
> THE COURT: You are looking at—if—if found guilty, you are looking at a potential of a long time—
> THE DEFENDANT: Yes, sir, Your Honor.
> THE COURT:—in the Department of Corrections. Do you understand that?
> THE DEFENDANT: I fully understand."

¶ 8     The trial court then inquired about whether the defendant had any legal training or

experience. The defendant responded that he had faced a jury trial before and that he is familiar

with the proceedings. The defendant stated that he went to trial in Georgia in 2011, he had legal

representation for the trial, and that he was found guilty. The trial court then stated the following:

> "THE COURT: I also want you to understand that—well, obviously you already know that if you can't afford an attorney, an attorney could—would be appointed to

represent you, and you have Mr. Philo representing you now from the Public Defender's Office. Do you understand that?

THE DEFENDANT: Yes, I understand.

THE COURT: All right. I want you to listen to me closely. I'm going to read this exhaustive list. I want you to understand presenting a defense is not simply a matter of telling one's story; so you just can't get up there and tell your story. There may be objections. You may not be able to get the story out because you're going—will be going against individuals who are trained in the legal field, so do you understand that?

THE DEFENDANT: Yes, sir, Your Honor.

* * *

THE COURT: Do you also understand by what I told you that naturally they're going to have an advantage over you for the simple fact that they're trained in the legal field. Do you understand that?

THE DEFENDANT: Yes, sir, Your Honor.

THE COURT: Also, I want you to understand that just because you're proceeding *pro se* you're not going to be able to complain about the representation on appeal. Do you understand that?

THE DEFENDANT: Yes, sir, Your Honor."

¶ 9 The trial court then cautioned the defendant again regarding self-representation and went through various example scenarios that could occur at trial where the court could not give the defendant special consideration simply because he is a *pro se* defendant and may not understand. The defendant indicated that he understood. The trial court stressed to the defendant that if he chose to proceed *pro se* he would be going into this alone and the trial court could not help him other than the basic instructions. The defendant indicated he understood. In addition, the trial court asked if the defendant persisted in his demand for a speedy trial, which the defendant responded to in the affirmative. The trial court then inquired about the defendant's age and level of education. The defendant stated that he was 35 years old and that he had "three years of college, business, office administration" and "a year and a half of technical school." The defendant stated that he was a "fabricator/welder." The following exchange then occurred:

"THE COURT: All right. All right. Mr. Higgs, I'll ask—I'll ask the question again. Do you wish to proceed to trial—

THE DEFENDANT: Yes, sir, Your Honor.

THE COURT:—as a self-represented litigant?

THE DEFENDANT: Yes, sir, Your Honor.

4

THE COURT: All right. Mr. Philo, you're dismissed from the representation of Mr. Higgs. Mr. Higgs, I've gone through—I've admonished Mr. Higgs on numerous aspects of going to trial on his own. He's entering into this knowingly and voluntary, and I will accept his waiver of counsel."

Immediately following, the defendant requested to renew his motion to reduce bond. The trial court held a hearing, at which the State informed the trial court that, if found guilty, the defendant faced several Class X felony offenses that "could be run consecutively." The defendant's motion to reduce bond was ultimately denied.

¶ 10     Throughout the defendant's pretrial settings, the trial court would continue to inquire of the defendant whether he wished to continue *pro se*. Specifically, on August 3, 2022, five days before the trial was scheduled, the following discussion occurred:

"THE COURT: We're going to Monday. It's happening on Monday. I'll ask you this again. I've asked you three or four times now. Do you still wish to proceed as a self-represented litigant on Monday?
THE DEFENDANT: Yes, sir, Your Honor.
THE COURT: Again, I want you to understand that you will be treated as a trained lawyer. So I will not allow during jury selection, during any part of this trial to—you to make any remarks that, well, I'm doing this by myself, I don't know what I'm doing, I'm not a trained lawyer. That's not going to happen. That's not going to happen during jury selection. That's not going to happen during trial. You will be held to the same standard as I'm holding the State to. I want you to understand that.
THE DEFENDANT: I fully understand.
THE COURT: Then again I ask you do you still wish to proceed Monday to trial represent is [*sic*] yourself?
THE DEFENDANT: What was this great country founded on?
THE COURT: That's a yes?
THE DEFENDANT: That's a yes. I'm definitely representing myself.
* * *
THE COURT: Mr. Higgs, we've also—I know probably at least twice that we've gone over the possible sentences. Do you understand the possible sentences?
THE DEFENDANT: Yes, sir, Your Honor, I understand the possible sentences.
THE COURT: Do you remember us going over them?
THE DEFENDANT: Yeah. I'm not worried about it, Your Honor. I'm innocent."

¶ 11     On August 10, 2022, the morning of trial, the following final discussion took place between the trial court and the defendant:

5

"THE COURT: All right. And I will ask you one more time, Mr. Higgs, is this what you want to do? Do you want to proceed to trial representing yourself?

THE DEFENDANT: Yes, sir.

THE COURT: All right. Let me ask you this question. Let me ask you a couple more questions in fact. No one's put any undue influence on you to act as a self-represented litigant, no one's pressured you or anything?

THE DEFENDANT: No, sir.

THE COURT: And no one's made any kind of promises to you or anything?

THE DEFENDANT: No, sir.

THE COURT: All right. And you're doing this of your own free will, correct?

THE DEFENDANT: Yes, Your Honor."

After the trial court discussed trial procedures and ruled on the final pretrial motions, the defendant requested counsel but withdrew that request after a recess. The trial court again confirmed the defendant wanted to represent himself.

¶ 12                                C. *Diagram of Incident for Reference*

¶ 13     Below is a diagram of the location where the incident took place for reference and is not to scale. This diagram is solely to aid the understanding of the evidence presented at trial and show the locations of the defendant, codefendants, and victims at the time of the shooting.



¶ 14                    D. *Summary of Evidence at Trial*

¶ 15     The trial began on August 10, 2022, and ended on August 17, 2022. The State had entered into an agreement with codefendant Cartez Beard, in which he pled guilty to aggravated battery with a firearm as to M.M., in exchange for a 22-year sentence and his truthful testimony at trial. Codefendant Lorenzo Bruce had not entered into any agreement with the State and did not testify at trial.

¶ 16     Beard was the defendant's cousin and knew Lorenzo Bruce. Beard testified that several weeks prior to September 9, 2021, he was with the defendant and Bruce at defendant's grandfather's house in East St. Louis. The defendant and Bruce left in Bruce's vehicle to sell someone a "little weed." About 20 minutes later, the defendant and Bruce ran back to the house. They were "enraged" and told Beard they had just been "robbed by Pee-wee and them." Beard later learned that "Pee-wee" was Marquise Chairs. The defendant and Bruce left and then returned

7

in Bruce's vehicle. Beard testified he heard both the defendant and Bruce say there were "going to get back with them and get up with them," which he understood to mean "when I see you, like I was going to kill you." The defendant and Bruce later showed Beard photographs of Chairs "and the other guy" who robbed them. Beard testified that the defendant and Bruce looked for those men over the next several weeks.

¶ 17 Marquise Chairs entered into an agreement with the State in which he would plead guilty to unlawful possession of a weapon by a felon in exchange for a sentence of 5 to 12 years and his truthful testimony. Chairs testified that he had been told his uncle and "Zoe"[1] had "supposedly got robbed" prior to September 9, 2021. Chairs' uncle told him to "be watching out for anything" from Zoe. Chairs did not know the defendant, Beard, or Bruce, had never seen the defendant before, and denied robbing the defendant or Zoe.

¶ 18 Trequion Holman testified that he had never seen the defendant before and did not know Zoe. Holman denied robbing anyone and denied hearing Chairs robbed anyone.

¶ 19 Beard testified that on September 9, 2021, the defendant borrowed his blue Dodge Journey, and both the defendant and Bruce returned in the Journey that afternoon. Bruce was in the front passenger seat with an "ARP pistol" and an "AK" rifle. The defendant "had an assault rifle" and a "ball magazine," which he took with him from the driver's seat to the back seat. All three men were wearing black. Beard then entered the driver seat and drove to the East Side Meat Market (Market), located at 510 Martin Luther King Drive, East St. Louis, Illinois.

¶ 20 The Market had entrances to the parking lot on King Drive and 6th Street. The State obtained several surveillance videos, particularly from the Market and Another Level, a business

_____

[1]Based on the record, "Zoe" refers to Lorenzo Bruce.

across the street. The State introduced into evidence two disks containing all of the videos, Exhibits 3 and 4, and a third disk containing selected clips, Exhibit 56.

¶ 21 Beard pulled into the Market parking lot from 6th Street at approximately 4 p.m. At that time, the people in the lot included Jimmie Nicholson, Mark Williams, and David Whitfield, gathered around Nicholson's white SUV near the Market building. Marquisha Collins was sitting in the driver's seat of her gray Mazda parked facing toward Nicholson's vehicle, with her two sons in the back seat, including three-year-old M.M. Between Collins' vehicle and the Market was parked a blue Toyota Rav4 with Demarcus Reed inside. Further from the Market and to the left of Collins' vehicle was Davianna Jennings in the driver seat of her silver Dodge Charger facing King Drive and the bus stop. Chairs was wearing a white t-shirt, and Holman was wearing a black tank top. They were standing at Jennings' vehicle on the driver's side. At the bus stop on King Drive was Camelita Lacroix with her fiancé and her two children.

¶ 22 As Beard pulled into the lot, he saw the defendant and Bruce look toward Chairs, and heard them say, respectively, "[T]hat's little dude," and, "[Y]eah." As the defendant told Beard to stop, Beard saw the defendant and Bruce "grabbing their guns" and "pulling *** their little ski masks down." When Beard stopped in the middle of the parking lot, the defendant and Bruce exited the vehicle on the passenger side armed with rifles and fired shots at Chairs, towards King Drive.

¶ 23 Camelita Lacroix testified that as she sat at the bus stop, she heard gunfire, the plexiglas pane behind her shattered, and she was shot in the elbow. She then fell onto her children in an effort to shield them from the gunfire. Lacroix lost the use of her arm.

¶ 24 Jennings testified that she heard shots from behind her vehicle and drove on to King Drive. Several bullets hit the rear and passenger side of her vehicle. Jennings did not see Chairs or anyone else with a gun.

9

¶ 25  Both Chairs and Holman testified that a dark SUV pulled into the lot. According to Chairs, three men dressed in black and wearing masks got out of the SUV and fired shots at him. Holman testified that two men wearing black with black masks armed with rifles got out of the passenger side of the SUV and fired shots at him. Holman saw a third man exit the driver's side. Chairs was not armed and neither Chairs nor Holman heard any shots prior to that moment. One bullet grazed Holman's left cheek, requiring stitches. Holman had a handgun in his pocket and fired one shot at the men as he fled. Chairs ran across King Drive and was shot in the back.

¶ 26  According to Beard, after Bruce and the defendant started shooting, a man next to the blue Rav4, Demarcus Reed, fired return shots in their direction. Beard grabbed the "AR pistol," got out, and started shooting at Reed. Beard saw Reed run around the Rav4, then run alongside Collins' Mazda after she drove around the Rav4. Beard continued firing at Reed as he fled. Surveillance video from the Market showed Reed holding a gun as he ran. On the Another Level video, Beard identified puffs of smoke around the Mazda and Rav4 as the shots he fired at Reed.

¶ 27  Collins testified that as she sat in her vehicle, she saw three people near the dark SUV fire "three big guns" at Chairs and Holman, then saw Chairs and Holman return fire. Collins drove around the Rav4 and exited left on King Drive. A bullet entered Collins' vehicle through the rear passenger-side door. Collins observed that M.M. had been shot and drove to the police station where officers then drove M.M. to the hospital. M.M. had injuries to his arm, abdomen, and spinal cord, leaving his legs paralyzed.

¶ 28  Beard testified that during the gunfire, the defendant ran around to the driver's side of the Journey. According to Beard, a man by the white SUV to his left started firing at them, and the defendant stated that he had been shot and returned fire in that direction.

10

¶ 29    Williams and Whitfield both testified that they and Nicholson were shot while standing near Nicholson's white SUV. They did not know who fired the shots and denied that any of the three of them were armed. Nicholson was shot in the chest and buttock and had several internal injuries. Williams was shot in the knee. Whitfield was shot in the back and had two broken ribs. The passenger side of Nicholson's SUV was hit by several shots and the police found no guns or ammunition inside.

¶ 30    The defendant, Bruce, and Beard ran from the lot on foot toward 6th Street. Beard testified that he knew that what he had been involved in was wrong. After running a few blocks, they dropped their guns and jumped down into the basement of a concrete structure. The police surrounded the structure and attempted for several hours to get them to come out. In the early morning hours on September 10, 2021, the defendant and codefendants exited the basement and were arrested. The defendant was taken to the hospital for gunshot wounds. Beard told the police they were "ambushed," but testified that was "a lie."

¶ 31    Near the concrete structure, the police found a black mask with Bruce's DNA and three guns: a "Cugir 7.62" rifle, a "Stag" rifle, and an "AR15 pistol." The Cugir 7.62 had been fired until empty. The Stag rifle was loaded with 58 rounds and had DNA from both the defendant and Beard. A total of 46 discharged shell casings were collected as evidence.

¶ 32    The State introduced the defendant's prior 2009 Georgia robbery conviction for the purposes of establishing his felon status for the possession of a weapon by a felon charge.

¶ 33    The defendant asserted the affirmative defense of self-defense at trial. He testified that he did not know Chairs or Holman and was never robbed by them. He testified that Beard picked him up in the Journey at 3:45 p.m. on September 9, 2021. The defendant got into the back seat, saw Bruce in the front passenger seat, and saw ammunition and several guns in the car. As Beard pulled

11

into the Market parking lot, the defendant saw "the guy in the blue car" aiming a gun "out the window" with the door "slightly ajar," then saw Holman to his right "reaching for a gun." The defendant feared they were being "boxed in" by "guys pulling guns." The defendant grabbed the Stag rifle as their vehicle was being shot at and he was shot in the arm. The defendant exited the vehicle and fired two shots towards Jennings' Charger but denied "aiming at anyone." The defendant was then shot in the chest. The defendant ran to the driver's side of the Journey, where he was shot in the back as he opened the door to look for his cellphone. The defendant denied firing any other shots. He testified that he fled behind Bruce and Beard and they all hid in the basement of the concrete structure. He dropped the Stag rifle before jumping down into the structure. Beard had a cellphone but did not call for help. He testified that, due to his injuries, he was unconscious much of the time before the police helped him out of the basement and took him to the hospital. The defendant did not recall talking to the police at the hospital and denied saying he did not remember the incident.

¶ 34    In rebuttal, the State introduced the defendant's video-recorded statement at the hospital, during which he said, "I don't remember nothing. Besides being shot, I don't know exactly what happened." The State also impeached the defendant with statements from his *pro se* pretrial motions denying he possessed a gun.

¶ 35                              E. *Jury Instructions*

¶ 36    The State requested that one instruction be given for the seven counts of first degree murder. The instruction was the standard IPI 6.07X issues instruction for attempted murder with additions to include the defendant's theory of self-defense and the State's theory of accountability. The issue instruction was granted over the defendant's objection and read as follows:

> "To sustain the charge of attempt first degree murder, the State must prove the following propositions:

12

*First Proposition*: That the defendant, or one for whose conduct he is legally responsible, performed an act which constituted a substantial step toward the killing of an individual; and

*Second Proposition*: That the defendant, or one for whose conduct he is legally responsible, did so with the intent to kill an individual.

*Third Proposition*: That the defendant, or one for whose conduct he is legally responsible, was not justified in using the force which he used.

If you find from your consideration of all the evidence that any one of these propositions has not been proved beyond a reasonable doubt, you should find the defendant not guilty.

If you find from your consideration of all the evidence that each one of these propositions has been proved beyond a reasonable doubt, you should find the defendant guilty."

Separate verdict forms for attempted first degree murder were given for each of the seven victims alleged in the State's indictment.

¶ 37    The State also requested one instruction for each potential firearm enhancement for attempted first degree murder, asking the jury to decide whether the defendant, "during the commission of the offense of attempt first degree murder," was "armed with a firearm" or "personally discharged a firearm," and one set of verdict forms for each enhancement. The trial court gave these instructions and verdict forms.

¶ 38    Additionally, the State requested an instruction for IPI 24-25.10, "Forcible Felon Not Entitled To Use Force." The instruction tendered read as follows: "A person is not justified in the use of force if he is attempting to commit first degree murder or committing aggravated battery with a firearm or committing aggravated battery of a child." The defendant initially objected but then withdrew his objection, and the instruction was given by the trial court.

¶ 39                                F. *Closing Arguments*

¶ 40    The State argued that a person is guilty of attempted murder if he, or someone for whom he is accountable, takes "a substantial step toward the killing of an individual," and did so "with the intent to kill an individual." The State argued that the "substantial step" element for "each of

13

those counts of attempt first degree murder" was proven by evidence that the defendant and Bruce were "shooting in the direction of Marquise Chairs." Additionally, the State argued that the defendant, Bruce, and Beard intended to kill Marquise Chairs and were all engaged in the same intent, "shooting up that parking lot trying to kill Marquise Chairs." The State emphasized as proof of "an intent to kill an individual" that Bruce fired 26 shots at Chairs. The State urged the jury to convict the defendant on all seven counts of attempt murder because "[w]hen they get out of that car and they're shooting at Marquise Chairs with the intent to kill him, that intent transfers to everybody else that's on that lot." The State also argued that the defendant admitted to exiting the vehicle with the "Stag Arms" rifle and shooting in the direction of the silver Charger that Chairs was standing beside. The State argued he was accountable for the conduct of Bruce and Beard, and that it was no coincidence that he exited the vehicle at the same time as Bruce, armed with a rifle, dressed in black, with a ski mask over his face. The State argued the video and the witness's testimony clearly demonstrates that the first shots were fired by the defendant, Bruce, and Beard. Further, the State argued that they were not acting in self-defense because they were the initial aggressors.

¶ 41    The defendant argued that when he got into the vehicle with Bruce and Beard he did not have "any knowledge of any intended act" and "at no point did [he] intend to harm anyone." He argued that he did not have on a "hoodie or an assassin's outfit or a mask." He stated that the story that Beard gave "never happened" and was a "flat out lie." In addition, he stated that both Chairs and Holman denied that a robbery ever happened and that they do not know him. The defendant also argued that Demarcus Reed, the individual in the blue Rav4, was the first person to fire shots. The defendant claimed that the video may not clearly show it, but "[Reed] possessed this weapon and he was firing this weapon as we approached, and I saw it coming." The defendant stated he

14

grabbed the weapon in self-defense, got out of the vehicle, and "let off two shots and went for cover." He argued that he was not the aggressor and that he did not shoot anyone.

¶ 42                                    G. *Jury Deliberations*

¶ 43    Jury deliberations began on August 17, 2022, at 12:37 p.m. and were held in a vacant courtroom. At 1:35 p.m., the jury sent a note to the court. The first note stated the following:

> "For the propositions #1 & #2, when they state 'an individual,' does this mean any individual or just the individual mentioned in each individual charge? This related to <u>any</u> of the first degree murder charges." (Emphasis in original.)

The trial court, the State, and the defendant discussed on the record what the court's response should entail. As to the first note, the State argued that the doctrine of transferred intent applies to attempt first degree murder charges and cited authority in support. The State argued that the trial court should instruct the jury that "when considering an individual, they may consider any individual." The defendant objected and argued the jury was asking whether the propositions applied to "each individual" named in the seven counts of attempted murder. The State noted that the language in the instruction does state "an individual," then argued that "[t]hose instructions do not have to apply specifically to set that specific intent against a person that was harmed by the action." Over the defendant's objection, the court replied to the first note in writing, "An individual may be any individual."

¶ 44    At 1:47 p.m., the jury sent a second note to the court stating, "We would like to view the videos of exhibits 3 & 4. (Another Level & Meat Market Surveillance)." The State argued the jury should view the exhibits in the manner similar to how they were viewed during trial. The jury should take their seats back in the jury box and the deputy clerk should set up the system and play the exhibits for the jury. The defendant objected arguing that the jury be allowed to watch the videos as they wished, with the ability to pause or slow the videos and to "get up close to the

15

screen." The State argued that People's Exhibits 3 and 4 contained additional files that were not published to the jury and giving the jury those exhibits without any sort of monitoring was a concern. The trial court suggested that it could admonish the jury not to view any subfolders on the exhibits, but the State was concerned that too many admonishments could create the appearance that the State is "trying to hide something when really we are simply trying to preserve the record of evidence that was admitted." By allowing the deputy clerk to play the exhibits, that would be avoided. The defendant continued to object and requested that the jury view the videos as close as possible. In addition, he argued that the exhibits were admitted into evidence and the jurors should be able to view any portion of those videos. Over the defendant's objection, the trial court ruled the jurors would watch the videos from the jury box, as at trial. The trial court confirmed both exhibits were admitted into evidence but limited the jurors to "the portions *** viewed" at trial.

¶ 45    The defendant objected again and the State argued that the "scope" of each exhibit was "limited" to "what was played off of that exhibit." The State added that it could be "prejudiced" by allowing the jury to watch unpublished portions of the exhibits because they will wonder "[w]hy were those not shown to us." The trial court suggested giving the jury the "consolidated video," Exhibit 56, to view. The defendant objected and argued the jurors requested the exhibits they did because "the consolidated portion is probably too small for them" and they wanted a "better view." The trial court then ordered the parties to create a list of files on Exhibits 3 and 4 containing videos published to the jury in Exhibit 56.

¶ 46    At 3:16 p.m., the jury sent a third note which contained, *inter alia*, questions concerning the "intent" element of the charged offenses:

> "If a person intended to harm person A, but others are harmed in the process, does the intent to harm person A also apply to the other persons who are harmed unintentionally?

16

If it has been established that intent of harm toward one individual or individuals has been established, does that mean that all parties are included in that intent?"

The State, citing the doctrine of transferred intent, submitted that the following language be used, "If you determine that a person has the requisite intent to harm an individual, that intent applies to all other individuals unintentionally harmed." The defendant initially objected, but the parties later agreed to a written response, which stated, "If you determine that a person has the requisite intent to harm an individual and acts so as to harm that individual that intent applies to all other individuals unintentionally harmed."

¶ 47    At 3:58 p.m., the jury sent out a fourth note asking the trial court when they will be able to view the videos they had requested. The jury explained they needed to view the videos before continuing with their deliberations and expressed frustration at the "slow pace." The prosecutor reported that he and the defendant had completed the list of files on Exhibit 3 the jury would be allowed to watch and were nearly done with Exhibit 4. The trial court sent a clerk into the jury room with instructions to play the designated portions of Exhibit 3 and 4.

¶ 48    At 4:15 p.m., the jury sent a fifth note asking if they could "watch the videos up closer rather than from the jury box, *** stop and start the videos, *** [and] zoom in and play at ½ speed." The State argued the manner of presentation of the videos during deliberations should be the same as during trial and cited authority. The defendant argued the jurors should be allowed to view the videos as they wished. Over the defendant's objection, the trial court replied to the fifth note writing, "No."

¶ 49    At 7:45 p.m., the jury sent out its sixth and final note, which read as follows:

"If we find the defendant guilty on several of the same charges, do we also have to find the defendant guilty on the rest of the same charges? If we believe beyond a reasonable doubt that the defendant is guilty on some of the same charges, but we have reasonable

17

doubts about the remaining same charges with other victims, can we have a different verdict on those charges?

Also, your answer to a previous question states that 'intent applies to all other individuals unintentionally harms.' [*sic*] This seems to suggest that if we find the defendant guilty of one charge (like attempt first degree murder toward one individual), we must find the defendant guilty of all the like charges against other victims (for example, attempt first degree murder) even though we may have reasonable doubt. Please clarify. Thank you."

The State suggested telling the jurors they have their instructions and should continue deliberations. The following exchange between the defendant and the trial court then occurred:

"THE COURT: Mr. Higgs?
THE DEFENDANT: I mean, simply put, if they have reasonable doubt, it's already in the instruction. If they have reasonable doubt, this tells them not to find me guilty.
THE COURT: So are you—let me ask you this, Mr. Higgs. Mr. Lewis [assistant state's attorney] made a suggestion to the response, what the Court should respond to the jurors. Are you making argument right now or are you suggesting some other type of response?
THE DEFENDANT: Yes, sir. I'm telling you that it's already in the instruction that if they're having reasonable doubt to render a verdict of not guilty.
THE COURT: You want me to instruct—so I'm clear, you want me to write back and instruct the jurors to find you not guilty?
THE DEFENDANT: That's not what I'm saying. You're simply mischaracterizing my words, Your Honor.
THE COURT: Well, that's why I'm trying to get to the bottom of it.
THE DEFENDANT: The question here says even though we may have reasonable doubt. It's already in the instructions for the charges if they have reasonable doubt, they're instructed to find me not guilty. The State must prove the case beyond a reasonable doubt."

The trial court determined that the State's response would be given and wrote in response to the note, "You've received the jury instructions you are to follow the instructions and continue to deliberate." The trial court then stated to the defendant that "what you've offered as to a response to the jurors, I'm not allowing that response." The defendant indicated that he understood.

¶ 50    At 9:25 p.m., the jury found the defendant guilty on all seven counts of attempted murder and seven counts of aggravated battery with a firearm, as well as unlawful possession of a weapon by a felon, but found him not guilty of aggravated battery of a child. With respect to "attempt first

18

degree murder," the jury also found the defendant was armed with a firearm and personally discharged a firearm during the offense.

¶ 51                            H. *Posttrial Proceedings*

¶ 52    The defendant filed five handwritten, *pro se* posttrial motions each consisting of several pages. Among his claims, he argued the "failure to properly instruct the jury on such issues as 'Transferred Intent' possibly influenced the jury." On September 21, 2022, the trial court held a hearing and heard arguments regarding the defendant's *pro se* posttrial motions. The trial court took the matter under advisement and issued a written order on September 27, 2022, denying the defendant's motions.

¶ 53    On September 29, 2022, at the defendant's request, the trial court appointed counsel for the defendant and the sentencing hearing was continued. On November 2, 2022, a hearing was held regarding defense counsel's motion to establish a sentencing range. The State argued the range for each count of attempted murder was 26-50 years—6-30 years for the Class X offense, plus a 20-year firearm enhancement for personally discharging a firearm during the commission of the offense. The State also argued all seven counts of attempt murder were mandatory consecutive because six victims suffered "severe bodily injury," making the sentencing range 182-380 years. The trial court determined that the defendant's minimum sentence was 182 years but noted the statute governing aggregate consecutive sentences set the maximum at 160 years—120 years for the two most serious felonies plus 40 years for the firearm enhancements. The State indicated that there was a potential conflict between sections of the sentencing statute that set a maximum aggregate consecutive sentence (730 ILCS 5/5-8-4(f)(2) (West 2020)), but mandated a consecutive sentence under section 5-8-4(d)(1) of the Code (*id.* § 5-8-4(d)(1)). The trial court stated that it would not sentence the defendant to anything other than 182 years or 160 years to be

19

served consecutively at 85% depending on its determination as to which section of the statute to apply.

¶ 54    On November 7, 2022, the trial court sentenced the defendant to 182 years in prison, consisting of seven consecutive terms of 26 years for each attempted murder count with the firearm enhancement applied. The trial court merged the seven convictions for aggravated battery with a firearm with the attempted murder convictions and imposed a concurrent term of seven years for the unlawful possession of a weapon by a felon. The trial court made the following finding regarding the aggregate maximum consecutive sentence issue:

> "I have discussed previously the Court is left with two sentencing issues, a sentencing enhancement under 720 ILCS 5/8-4 which leads to a conclusive sentence at a minimum of 182 years. And then 730 ILCS 5/4-8-5/8-4 with a minimum of 160 years in the aggregate. The Court finds that 720 ILCS 5/8-4 with the enhancement applies to this case."

On December 1, 2022, the defendant filed a motion to reconsider sentence, which was denied after argument on December 2, 2022. The defendant filed a timely notice of appeal on December 16, 2022.

¶ 55                                  II. ANALYSIS

¶ 56    On appeal, the defendant raises several issues. The defendant argues (1) the trial court erred when it allowed the defendant to proceed *pro se* without first receiving a knowing waiver of his right to counsel; (2) the trial court's instructions to the jury denied him the right to a fair trial; (3) the trial court placed improper restrictions on the jurors' review of the video exhibits; (4) his sentencing counsel was ineffective for failing to object to the imposition of more than one firearm enhancement; and (5) his sentence should be reduced pursuant to section 5-8-4(f)(2) of the Code.

¶ 57                              A. *Waiver of Counsel*

¶ 58    The defendant argues that the trial court (1) violated the defendant's constitutional right to counsel where his waiver was not made knowingly and voluntarily and (2) failed to substantially

20

comply with the admonishments required by Illinois Supreme Court Rule 401(a). The defendant acknowledges that he did not preserve these claims in his posttrial motions, and thus he has forfeited the claims. Failure to specify grounds in writing in a motion for a new trial has been held to be a forfeiture of the issue on review in the absence of plain error. *People v. Albea*, 2017 IL App (2d) 150598, ¶ 16. However, the defendant argues that his claims should be reviewed under the second prong of the plain-error doctrine, because "the absence of an effective waiver of counsel has consistently been treated as a serious error that warrants second-prong plain-error review."

¶ 59    At the time the defendant filed his opening brief, the Illinois Supreme Court had yet to issue its decision in *People v. Ratliff*, 2024 IL 129356. We granted supplemental briefing on this issue after the decision in *Ratliff* became final. *Ratliff* determined that "[b]ecause a Rule 401(a) violation is not akin to structural error, such a violation, if not raised in a postplea or posttrial motion, is not cognizable as second-prong plain error but only as first-prong plain error." *Id.* ¶ 46. Thus, the defendant's claim of a Rule 401(a) violation under second-prong plain error is foreclosed by *Ratliff*. In the defendant's supplemental brief, he requests that his claims be reviewed under the first prong of the plain-error doctrine and argues accordingly. Additionally, he asserts that the decision in *Ratliff* only foreclosed Rule 401(a) violations from review under second-prong plain error and not constitutional claims of error affecting his sixth amendment right to counsel.

¶ 60    The State responds by arguing that the defendant's claim of a Rule 401(a) violation has been waived, not forfeited and thus *Ratliff* is dispositive of the issue. In addition, the State maintains that the defendant's constitutional claim is entrenched in his Rule 401(a) claim of a failure to substantially comply with the required admonishments, which is already waived and foreclosed by *Ratliff*. Accordingly, the State argues the defendant should not be allowed to raise

21

these claims in a supplemental brief where the defendant did not originally argue them in his opening brief.

¶ 61    Ordinarily "[p]oints not argued [in an opening brief] are forfeited and shall not be raised in the reply brief, in oral argument, or on petition for rehearing." Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020). Considering the unique circumstances of this appeal, however, and the timing of the *Ratliff* decision during its pendency, we address these issues.

¶ 62    It is axiomatic that we first address whether the defendant's claims on appeal are waived or forfeited. "[W]aiver of constitutional claims consequent to a guilty plea is distinguishable from a forfeiture of such claims that may be excused under our plain error doctrine as memorialized in Rule 615(a) (Ill. S. Ct. R. 615(a) (eff. Jan. 1, 1967))." *Ratliff*, 2024 IL 129356, ¶ 22.

> "Rule 615(a) is concerned with waivers that result from failing to bring an error to the trial court's attention. Under that Rule, [p]lain errors or defects affecting substantial rights may be noticed [on appeal] although they were not brought to the attention of the trial court. [Citation.] In relation to a guilty plea, by contrast, waiver refers to the voluntary relinquishment of a known right. [Citation.] *** Rule 615(a) in no way speaks to waivers ***." (Internal quotation marks omitted.) *Id.*

¶ 63    Unlike the defendant in *Ratliff*, here, the defendant did not plead guilty but was instead convicted after a jury trial. This removes him from the purview of Illinois Supreme Court Rule 604(d) and the "waiver rule" it sets forth. *Id.* ¶ 23 n.2 (" 'by its explicit terms, Rule 604(d) states that issues not preserved in a motion to vacate a guilty plea are waived' " (quoting *People v. Stewart*, 123 Ill. 2d 368, 374 (1988))). Thereafter, the defendant failed to raise these claims in a posttrial motion. Accordingly, where the defendant did not plead guilty and failed to raise his claims in a posttrial motion, his claims are forfeited, not waived. Forfeiture is a limitation on the parties and not the court. *Id.* ¶ 26. However, as discussed further below, we find that the defendant's forfeiture stands where the trial court substantially complied with the requirements of

22

Rule 401(a) and did not abuse its discretion in finding a valid waiver. Consequently, where there is no error, plain-error review is unavailable. *People v. Ryder*, 2019 IL App (5th) 160027, ¶ 45.

¶ 64     Specifically, the defendant claims that the trial court "had a duty to ensure" that he understood the legal concepts of accountability and transferred intent that applied to the case. Additionally, the defendant argues that the trial court failed to admonish him of the "mandatory minimum sentence [of 182 years] if he was found guilty on all counts and if all sentencing enhancements sought by the State applied." Instead, it only informed him of the sentencing range on a Class X felony being 6-30 years. The defendant also argues that the trial court's statement that it did not know whether the sentences would run consecutively and that he was "looking at a potential of a long time" in prison does not substantially comply with the Rule. Additionally, he argues that the trial court never mentioned the possible firearm enhancements. Lastly, he argues that, due to the above failures, no waiver of counsel could have been valid.

¶ 65     Whether the trial court properly admonished the defendant presents a question of law we review *de novo*. *People v. Pike*, 2016 IL App (1st) 122626, ¶ 114. However, the court's ultimate finding of a valid waiver of counsel is reviewed for an abuse of discretion. *Id.*

¶ 66     The sixth amendment to the United States Constitution (U.S. Const., amend VI) guarantees an accused in a criminal proceeding both the right to the assistance of counsel and the correlative right to proceed without counsel. *Faretta v. California*, 422 U.S. 806, 832-34 (1975). Our courts have long recognized that the right to self-representation is "as basic and fundamental as [the] right to be represented by counsel." (Internal quotation marks omitted.) *People v. Nelson*, 47 Ill. 2d 570, 574 (1971). An accused may therefore waive his constitutional right to counsel as long as the waiver is voluntary, knowing, and intelligent. *People v. Haynes*, 174 Ill. 2d 204, 235 (1996). "Although a court may consider the decision unwise, a defendant's knowing and intelligent

23

election to represent himself must be honored out of ' "that respect for the individual which is the lifeblood of the law." ' " *Id.* (quoting *People v. Silagy*, 101 Ill. 2d 147, 180 (1984), quoting *Illinois v. Allen*, 397 U.S. 337, 350-51 (1970) (Brennan, J., concurring)).

¶ 67    Illinois Supreme Court Rule 401(a) governs the trial court's acceptance of an accused's waiver of counsel in Illinois. Rule 401(a) states:

"Any waiver of counsel shall be in open court. The court shall not permit a waiver of counsel by a person accused of an offense punishable by imprisonment without first, by addressing the defendant personally in open court, informing him of and determining that he understands the following:

(1) the nature of the charge;

(2) the minimum and maximum sentence prescribed by law, including, when applicable, the penalty to which the defendant may be subjected because of prior convictions or consecutive sentences; and

(3) that he has a right to counsel and, if he is indigent, to have counsel appointed for him by the court." Ill. S. Ct. R. 401(a) (eff. July 1, 1984).

¶ 68    Illinois courts have recognized that compliance with Rule 401(a) is required for an effective waiver of counsel. *Haynes*, 174 Ill. 2d at 236. For 30 years, Illinois courts have recognized that "[s]trict technical compliance with Rule 401(a), however, is not always required. Rather, substantial compliance will be sufficient to effectuate a valid waiver if the record indicates that the waiver was made knowingly and voluntarily, and the admonishment the defendant received did not prejudice his rights." *Id.* (citing *People v. Johnson*, 119 Ill. 2d 119, 132 (1987)). Imperfect or incomplete admonishments regarding the potential sentencing range may still comply with the rule

24

if the record otherwise demonstrates a knowing and intelligent waiver. See *People v. Wright*, 2017 IL 119561, ¶¶ 51, 55.

¶ 69    Upon careful review of the record in this case and the detailed recitation of the facts above, there was substantial compliance with Rule 401(a). When the defendant initially indicated that he wished to proceed *pro se*, the trial court gave him additional time to think about the decision. Thereafter, the defendant was unequivocal in his request to proceed *pro se*. The trial court then took exceptional time to admonish the defendant pursuant to the Rule while even providing example scenarios or potential complications with self-representation. The trial court informed the defendant of each of the three essential admonishments required by Rule 401(a). The trial court examined the charges with the defendant and explained each offense relative to the 16 counts charged in the indictment. The trial court explained that each offense was a Class X felony punishable by 6 to 30 years in prison with 3 years of mandatory supervised release. We note that count 8, unlawful possession of a weapon by a felon, is not a Class X felony, but find that this omission did not invalidate the defendant's waiver of counsel where the defendant was not prejudiced by the admonishment of a more severe penalty and that count was to run concurrent to the others. Additionally, the trial court, although inartfully, explained to the defendant the possibility of consecutive sentencing in his case. The defendant twice acknowledged that he understood the trial court when it explained consecutive sentencing. Thus, the defendant understood that he was facing numerous Class X felonies, each with a penalty of up to 30 years, that could run consecutively. Again, when the trial court explained that he was "looking at a potential of a long time" in prison, the defendant stated he "fully" understood. Further, the trial court explained, and the defendant understood, that he had a right to counsel. Lastly, the trial court

informed him that if he proceeded *pro se*, he would be held to the same standards to which a lawyer would be held and, if convicted, he could not complain of his own competency.

¶ 70   We do not diminish the importance of correct admonishments as to the actual maximum sentence allowed. Each case, however, must be evaluated on its own particular set of facts. Based upon the detailed facts recited above, we conclude that the trial court substantially complied with Rule 401(a). See *People v. Johnson*, 119 Ill. 2d 119, 132 (1987) (holding that the admonishment the defendant received substantially complied with the rule despite the trial court incorrectly informing the defendant under Rule 401(a) that the minimum sentence was a "number of years" when it was actually natural life in prison).

¶ 71   We find that the trial court did not abuse its discretion and that the defendant's decision to waive counsel was made freely, knowingly, and intelligently. The trial court elicited from the defendant that he was 35 years old, had "three years of college, business, office administration" and "a year and a half of technical school," and had previously faced a jury trial in a felony case. He expressed an "unequivocal" desire to represent himself and reiterated that desire a number of times. Additionally, he repeatedly indicated to the trial court that he was concerned for his speedy trial rights and that he was "not worried" about the possible sentences, because he was "innocent." Defendant's decision to waive his right to counsel and proceed *pro se* did not hinge on the maximum sentence allowed for the charged offenses. Accordingly, the record establishes that defendant's decision to waive counsel was made knowingly and intelligently. See *People v. Coleman*, 129 Ill. 2d 321, 336 (1989) (holding that the record established that the defendant had specific, legitimate reasons for waiving his right to counsel, including his dissatisfaction with counsel's representation, which demonstrated that he would have waived counsel regardless of the length of the minimum sentences prescribed by law).

26

¶ 72    Finally, there is no basis for us to conclude that the defendant was prejudiced by the trial court's failure to admonish him of the 182-year minimum sentence or the firearm enhancements. The defendant does not even allege that he would not have proceeded to represent himself if he had known the exact sentencing range with the enhancements included. Instead, the defendant stated he was not concerned with the possible sentences, because he was "innocent." Further, at the time of the defendant's waiver of counsel, the State was not seeking firearm enhancements for the attempted murder charges. Only later did the State file a notice of intent to seek the enhancements which was explained to the defendant in open court. The trial court informed the defendant that he was "on notice" of the enhancements and the defendant acknowledged the same without reinvoking his right to counsel.

¶ 73    For these reasons, we conclude that the trial court substantially complied with Rule 401(a), and the defendant made a voluntary, knowing, and intelligent waiver of counsel prior to being allowed to proceed *pro se*. Thus, where the trial court did not err, plain-error review under either prong of the doctrine is unavailable and the defendant's forfeiture stands.

¶ 74                                    B. *Jury Instructions*

¶ 75    Next, the defendant argues that the trial court's "instructions to the jury denied [him] a fair trial by (1) allowing the jury to find [him] guilty of seven counts of attempted murder based on fewer than seven acts, (2) failing to correct the jurors' belief that they were required to convict [him] on all counts if they found any single count proven, and (3) introducing a new theory of guilt during jury deliberations."

¶ 76    Generally, the giving of jury instructions is reviewed for an abuse of discretion. *People v. Hartfield*, 2022 IL 126729, ¶ 45. However, when the question is whether the jury instructions accurately conveyed to the jury the applicable law, our review is *de novo*. *Id.* A jury instruction

27

error, although one of constitutional magnitude, is not necessarily a structural error and therefore does not result in automatic reversal. *Id.* ¶ 42. If the error was preserved, then harmless-error analysis applies. *Id.* If the error was forfeited, then plain-error analysis applies. *Id.*

¶ 77     The defendant claims that he has preserved these issues for appeal based on his objections at trial relating to the trial court's responses to the jury's questions during deliberations, and the renewal of these objections in his posttrial motions. He points to two sentences contained within his numerous, handwritten *pro se* posttrial motions to support this assertion: "The Jury was vaguely instructed on transferred intent, causing damaging prejudice and causing me to stand an unfair trial," and "The failure to properly instruct the jury on such issues as 'Transferred Intent' possibly influenced the jury to vote on conviction." The defendant then utilizes these two generalized statements to extrapolate very specific and distinct arguments on appeal—arguments he claims that the trial court "clearly had an opportunity to review," and thus are preserved. We find that the arguments the defendant now advances on appeal were not presented to the trial court in a posttrial motion and are forfeited. See *Albea*, 2017 IL App (2d) 150598, ¶ 16. However, the defendant argues that these unpreserved claims are reviewable under either prong of the plain-error doctrine.

¶ 78     The plain-error rule bypasses normal forfeiture principles and allows a reviewing court to consider unpreserved claims of error in specific circumstances. *People v. Averett*, 237 Ill. 2d 1, 18 (2010). We will apply the plain-error doctrine when:

> "(1) a clear or obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error, or (2) a clear or obvious error occurred and that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the

28

judicial process, regardless of the closeness of the evidence." *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007).

The first step of plain-error review is determining whether any error occurred. *People v. Walker*, 232 Ill. 2d 113, 124-25 (2009).

¶ 79    We first address the defendant's third argument, that he was denied a fair trial by the trial court introducing a new theory of guilt during jury deliberations. The defendant argues that the trial court erred when it introduced the theory of transferred intent in response to the jury's questions during deliberations by responding that "an individual may be any individual." Further, he argues that the State "made no mention of transferred intent in the indictment" and did not request a separate jury instruction on transferred intent or submit a modified instruction incorporating the same. Thus, the defendant argues, that the State was precluded from arguing, as it did in closing, that the intent to kill Chairs or Holman transferred to the unintended victims on the lot, and the trial court erred when it provided instruction on the same.

¶ 80    Here, the law is clear: "a person may be properly convicted under the theory of transferred intent even if the State does not specifically allege that theory in the charging instrument." *People v. Hill*, 276 Ill. App. 3d 683, 691 (1995). Further, the defendant did not object to the State arguing transferred intent to the jury during trial or the lack of a separate transferred intent instruction. Evidence was presented at trial and arguments made by both parties regarding the defendant's motive in the shooting, or lack thereof, regarding Chairs, Holman, and the five innocent bystanders who were shot. Moreover, the law is well settled that the doctrine of transferred intent is applicable in attempt murder cases. *Id.* at 688. While the defendant objected to the trial court's initial response to the jury during deliberations regarding transferred intent, the State's requested instruction on attempted murder, Illinois Pattern Jury Instructions, Criminal, No. 6.07X, allowed for the theory

29

of transferred intent. The pattern jury instruction for attempted murder given at the defendant's trial stated,

"the State must prove *** [t]hat the defendant, or one for whose conduct he is legally responsible, performed an act which constituted a substantial step toward the killing of an individual" and that he, or one for whose conduct he is legally responsible, did such act "with the intent to kill an individual."

"Jury instructions for attempted murder generally do not specify a victim's name, 'nor is there a place for the victim's name in the Illinois Patter Jury Instructions.' " *People v. Willingham*, 2020 IL App (1st) 162250, ¶ 63 (quoting *People v. Malone*, 37 Ill. App. 3d 185, 191 (1976)). Indeed, the pattern instructions intentionally refer to 'an individual' to allow for the doctrine of transferred intent. *Id.* Accordingly, we find that the trial court did not err when it responded to the jury's questions regarding transferred intent and that the State was allowed to raise the theory based on the attempted murder instructions given at trial.

¶ 81     Next, we address the defendant's argument that the trial court's instructions allowed the jury to find the defendant guilty of seven counts of attempted murder for fewer than seven acts. The defendant notes the State charged Higgs with seven counts of attempted murder, arguing each shot that injured a victim was a separate act justifying a separate conviction. He argues that, while the indictment properly alleged separate acts, the State failed to prove each count independently at trial. Instead, it claimed that a single act—firing at one victim (Chairs)—satisfied the *actus reus* element for all seven charges, including for victims not targeted or shot by the defendant. Specifically, the defendant takes issue with the State's argument during closing that "[w]hen they get out of that car and they're shooting at Marquise Chairs with the intent to kill him, that intent transfers to everybody else that's on that lot" and that the jury can use that as the "substantial step

30

toward the killing of an individual" to find the defendant guilty of each of the attempted murder charges. We note here that the defendant never objected to the State's arguments regarding transferred intent during closing. Further, he argues that the trial court compounded this error by issuing improper responses to the jury's questions during deliberations. He claims that when the trial court instructed the jury that "an individual may be any individual" and "[i]f you determine that a person has the requisite intent to harm an individual and acts so as to harm that individual that intent applies to all other individuals unintentionally harmed," the trial court allowed the jury to convict Higgs on all seven counts based on fewer than seven acts, "possibly only one."

¶ 82     We are not persuaded by the defendant's argument. The State chose to focus its closing argument on the moment the defendant stepped out of the vehicle with the codefendants and began firing his weapon toward Chairs and Holman, because this initial act was critical in establishing the State's theory of accountability, which would lead to convictions for each count alleged for the unintended victims. That was the meaning of the State's argument during closing. This singular act solidifies the defendant's participation in the crime and serves as the basis that the defendant was engaged in a common criminal design. To prove that a defendant had the intent to promote or facilitate the crime, the State must present evidence that establishes, beyond a reasonable doubt, "that (1) defendant shared the criminal intent of the principal or (2) there was a common criminal design." *People v. Willis*, 2013 IL App (1st) 110233, ¶ 79. The State recognized that once the defendant's accountability is established by this act, the acts that follow thereafter in furtherance of that common purpose are attributable to the defendant and the codefendants. The common design rule holds that "where two or more persons engage in a common criminal design or agreement, any acts in the furtherance of that common design committed by one party are considered to be the acts of all parties to the design or agreement and all are equally responsible

31

for the consequences of the further acts." *In re W.C.*, 167 Ill. 2d 307, 337 (1995). When the defendant, Bruce, and Beard were fired upon by a third party as a result of their initial firing at Chairs and Holman, they returned fire in furtherance of that initial act injuring innocent bystanders. This was exactly what codefendant Beard testified to at trial and the surveillance video of the incident depicts the same.

¶ 83   Further, the doctrine of transferred intent applied to the unintended victims that were injured during the course of these events. See *People v. Edmondson*, 2018 IL App (1st) 151381, ¶ 65. No one disputes that three-year-old M.M., who was shot in the spine and paralyzed for life during the commission of this offense, was an unintended victim in this case. Under the doctrine of transferred intent, "[w]here someone in the commission of a wrongful act commits another wrong not intended, or where in the execution of an intent to do wrong, an unintended act resulting in a wrong ensued as a natural and probable consequence, the one acting with a wrongful intent is responsible for the unintended wrong." *People v. Psichalinos*, 229 Ill. App. 3d 1058, 1067 (1992). The doctrine of transferred intent applies "when a third person is injured as a result of a defendant's assault upon another person." *People v. Burrage*, 269 Ill. App. 3d 67, 76 (1994). When the defendant and codefendants were fired upon by a third party as a result of their firing at Chairs and Holman, Beard returned protective cover fire for his codefendants when they were trying to kill Chairs. Beard aided and abetted the defendant and Bruce in trying to kill Chairs, which resulted in the injuries to innocent victims. With the State having established accountability, the defendant was criminally responsible for the acts of Beard when he returned fire injuring innocent bystanders.

¶ 84   In the context of the circumstances in this case, the trial court did not err in its responses to the jury regarding transferred intent. The responses given by the trial court accurately described the doctrine of transferred intent as it applied in this case and did not permit the jury to convict the

32

defendant based on fewer than seven acts. This is especially true where the instructions also included principles of accountability, making clear that the defendant could be held responsible for the actions of his codefendants if they were done in furtherance of a common criminal purpose. Moreover, the trial court issued, and the jury was required to sign, separate and distinct verdict forms as to each individualized victim and the jury was instructed to consider and apply the propositions of attempted murder to each victim.

¶ 85    Lastly, the defendant argues that the trial court erred by failing to properly respond to the final jury question during deliberations. "The general rule when a trial court is faced with a question from the jury is that the court has a duty to provide instruction to the jury when the jury has posed an explicit question or requested clarification on a point of law arising from facts about which there is doubt or confusion." *People v. Millsap*, 189 Ill. 2d 155, 160 (2000). "Nevertheless, a trial court may exercise its discretion to refrain from answering a jury question under appropriate circumstances." *Id.* "Appropriate circumstances include when the instructions are readily understandable and sufficiently explain the relevant law, where further instructions would serve no useful purpose or would potentially mislead the jury, when the jury's inquiry involves a question of fact, or where the giving of an answer would cause the court to express an opinion that would likely direct a verdict one way or another." *Id.* The trial court's decision whether to answer and how to answer questions asked by jurors during deliberations will not be disturbed absent an abuse of discretion. *People v. Landwer*, 279 Ill. App. 3d 306, 314 (1996).

¶ 86    Here, the jury inquired as follows:

> "If we find the defendant guilty on several of the same charges, do we also have to find the defendant guilty on the rest of the same charges? If we believe beyond a reasonable doubt that the defendant is guilty on some of the same charges, but we have reasonable doubts about the remaining same charges with other victims, can we have a different verdict on those charges?

33

Also, your answer to a previous question states that 'intent applies to all other individuals unintentionally harms.' [*sic*] This seems to suggest that if we find the defendant guilty of one charge (like attempt first degree murder toward one individual), we must find the defendant guilty of all the like charges against other victims (for example, attempt first degree murder) even though we may have reasonable doubt. Please clarify. Thank you."

As detailed in the background section above, when the trial court reviewed the question with the defendant and State present, the State requested that the response be that "they have received the instructions and to continue their deliberations." The defendant did not expressly object to the State's suggested response or offer an alternative response but instead simply recognized that the answer to the jury's question was already in the instructions they had received. The trial court did not directly answer the jury's question but responded by stating, "You've received the jury instructions you are to follow the instructions and continue to deliberate." The defendant argues that by responding in this way the trial court effectively directed the jurors to convict him on multiple counts of attempted murder despite their "reasonable doubts," and did nothing to correct the jury's misapprehension. The State argues that there was no error in the trial court referring the jurors to their previous instructions because answering the questions as phrased risked misleading the jurors or directing their verdicts, and the answer to the jury's question was contained in the initial instructions.

¶ 87    We find that the trial court did not abuse its discretion in its response. The trial court's initial instructions accurately conveyed the elements of each attempted murder charge and emphasized the jury's duty to consider each count individually. Further, the trial court provided separate verdict forms, consisting of not guilty and guilty, for each of the named victims. The jury was required to treat each victim separately when determining the defendant's guilt for attempted murder. Additionally, as the defendant recognized during deliberations, the initial instructions clearly directed the jurors to find the defendant not guilty if they determined the State had not

34

proven each proposition as to each count beyond a reasonable doubt. Furthermore, the jury's note, which was a full page and contained multiple questions, was directly inviting a response from the trial court that would likely direct a verdict one way or another. Although the jury expressed confusion, under the circumstances of this case, the trial court's determination to avoid directly responding to the jury's questions was not an abuse of its discretion.

¶ 88                                C. *Review of Video Exhibits*

¶ 89    Next, the defendant argues that the trial court committed reversible error when it restricted access to the entirety of the videos contained in People's Exhibits 3 and 4 and limited the manner in which the jury could review those videos.

¶ 90    Initially, we note that defendant acknowledges that he did not preserve this issue in a posttrial motion. Thus, the issue was forfeited and may not be considered on appeal, unless there was plain error. Ill. S. Ct. R. 615(a) (eff. Jan. 1, 1967). The defendant invokes the first prong of the plain-error doctrine.

¶ 91    The defendant must first establish that a clear or obvious error occurred. *People v. McLaurin*, 235 Ill. 2d 478, 497-98 (2009). " '[T]he plain error exception will be invoked only where the record *clearly* shows that an alleged error affecting substantial rights was committed.' " (Emphasis in original.) *People v. Hillier*, 237 Ill. 2d 539, 549 (2010) (quoting *People v. Hampton*, 149 Ill. 2d 71, 102 (1992)). It is well established that whether evidentiary items should be taken to the jury room rests within the discretion of the trial judge, whose decision will not be disturbed unless there was an abuse of discretion to the prejudice of the defendant. *People v. Hollahan*, 2020 IL 125091, ¶ 11.

35

¶ 92    In this case, jury deliberations took place in the courtroom where the trial took place rather than a separate, smaller jury room.[2] The defendant argues that the trial court abused its discretion by limiting the jury's access to surveillance video exhibits during deliberations. Specifically, defendant claims error in the trial court's refusal to allow the jury to view the entirety of People's Exhibits 3 and 4, its denial of the jury's request to pause, zoom, or slow the videos, and its decision to have the exhibits replayed under controlled conditions by the court clerk.

¶ 93    As an initial matter, it is well settled that the decision whether to allow the jury to review exhibits during deliberations is committed to the sound discretion of the trial court. *Id.* Contrary to the defendant's argument, the record establishes that the trial court acted reasonably in crafting procedures to accommodate the jury's request while safeguarding the integrity of the proceedings. As the State notes, and the record confirms, the surveillance videos in question were voluminous and contained lengthy segments of irrelevant or inadmissible content, including footage unrelated to the charged offenses. Only select excerpts were presented to the jury at trial, and the defendant and the State worked together to compile an agreed upon list of the relevant timeframes from those exhibits that the jury would review. Further, the laptop used to play the videos belonged to the state's attorney's office and contained confidential materials unrelated to the defendant's case. The trial court, working with both parties, arranged for the jury to view all portions of the videos that had been previously published at trial, with the playback handled by the court clerk under instructions to avoid any communication with jurors. Under these circumstances, the trial court reasonably exercised its discretion in allowing the jury to review only those published segments

---

[2]While the record indicates that pretrial delays occurred in this case as a result of the COVID-19 pandemic, it is not clear whether this was the basis for jury deliberations taking place in the courtroom.

and the procedure employed did not prejudice the defendant where he actively participated in compiling the list.

¶ 94    Additionally, the denial of the jury's request to pause, zoom, or slow the videos did not constitute error. The trial court acted within its discretion to limit juror interaction with sensitive equipment to avoid inadvertent access to unpublished material or risk of improper contact with the clerk. Moreover, the jury had previously viewed multiple angles of the incident from the relevant video clips during trial with extensive commentary by the witnesses including the defendant. The trial court reasonably ensured that the jurors were exposed to the same evidentiary conditions during deliberations. The trial court's decision to have the clerk play the admitted clips—without the presence of any party or the judge and under strict non-communication instructions—was consistent with the Illinois Supreme Court's decision in *Hollahan*. See *People v. Hollahan*, 2020 IL 125091 (where the court rejected a claim of plain error after a jury was shown video evidence in a controlled courtroom setting with appropriate safeguards in place). Lastly, we find the defendant's reliance on *People v. Cavitt*, 2021 IL App (2d) 170149-B, unpersuasive where it is readily distinguishable. Unlike *Cavitt*, the trial court here did not offer any commentary on the evidentiary value of the videos nor later reverse several convictions based on the court's own multiple viewings of the videos posttrial. Where plain error was established in *Cavitt* based on the combination of the trial court's restrictions on the videos and the trial court's improper comments to the jury, which is absent in the present case, we decline to find plain error.

¶ 95                    D. *Ineffective Assistance at Sentencing*

¶ 96    Next, the defendant argues that his sentencing counsel was ineffective for failing to object to the trial court's imposition of the 20-year "personal discharge" firearm enhancements to each of the seven counts of attempted murder. The defendant contends that the trial court erred in

37

imposing seven firearm enhancements because the State submitted only a single enhancement finding form to the jury, and thus, only one enhancement was properly authorized. As a result, the defendant argues that his counsel was ineffective for failing to preserve this issue at sentencing.

¶ 97    In support, defendant relies on *Apprendi v. New Jersey*, 530 U.S. 466 (2000), and claims that each enhancement must be supported by a separate jury finding beyond a reasonable doubt. He argues that "because the State sought to enhance each sentence, it had to obtain a finding that the defendant fired a gun during each offense, not just during the offense." He asserts that, because the jury signed only one verdict form finding he personally discharged a firearm, the court was without authority to impose more than one enhancement. He further argues that counsel's failure to raise this specific challenge constituted ineffective assistance and that had the issue been properly raised, a different outcome—*i.e.*, the imposition of fewer enhancements—was reasonably probable.

¶ 98    The State responds that the defendant forfeited this claim by failing to object to the verdict forms at trial and cannot now raise it under the guise of ineffective assistance of counsel. Further, the State maintains that counsel at sentencing did argue that only a single enhancement should apply, just under a separate theory, thereby defeating any claim of deficient performance. Additionally, the State contends that the trial court properly imposed an enhancement for each attempted murder conviction given that each involved a separate victim and the jury found the defendant had personally discharged a firearm during the commission of the offense. The State also notes that the defendant himself admitted to firing two shots during the incident, and the evidence supporting his discharge of a firearm was overwhelming and uncontested. The State recognizes that *Apprendi* requires submission of "a separate finding form for **each enhancement** at issue" and argues that the State satisfied that requirement where the two enhancement factors at

issue were submitted to the jury and were restricted to the attempted murder charges. (Emphasis in original.) The State argues the defendant's assertion that "a separate finding form had to be incorporated into each of the separate verdict forms for the seven victims is not supported by case law."

¶ 99    In order to prevail on a claim of ineffective assistance of counsel, the defendant must show that counsel's performance fell below an objective standard of reasonableness and that counsel's deficient performance resulted in prejudice. *People v. Campos*, 2024 IL App (2d) 230056, ¶ 64. Prejudice, in this context, means a defendant must demonstrate that there is a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different. *Id.* A claim of ineffective assistance of counsel is reviewed *de novo*. *People v. Lewis*, 2022 IL 126705, ¶ 48.

¶ 100   Here, we find that counsel at sentencing was not ineffective for failing to object to the trial court's imposition of the firearm enhancement to each count of attempted murder on this basis for several reasons. First, sentencing counsel did object to the imposition of multiple firearm enhancements and specifically argued that only one enhancement should be imposed, or that none be applied. Next, counsel sought mitigation based on provocation and presented arguments to support a minimum sentence. Additionally, counsel had no basis to raise this issue where the defendant, while *pro se* at trial, did not object to the enhancement verdict/finding forms. Accordingly, though the basis for counsel's objection does not exactly mirror the defendant's argument on appeal, we cannot say that counsel's failure to raise this specific argument fell below an objective standard of reasonableness.

¶ 101   Further, assuming *arguendo* that counsel's performance was deficient, we would find that the defendant was not prejudiced. If the underlying claim has no merit, no prejudice resulted and

39

claims of ineffective assistance of counsel at trial must fail. *People v. Pitsonbarger*, 205 Ill. 2d 444, 465 (2002). Here, even if counsel had raised the specific *Apprendi* violation now claimed on appeal, there is not a reasonable probability that the result of the proceeding would have been different. The State gave pretrial notice to the defendant that it was seeking 15- and 20-year firearm enhancements "on each count" of attempted murder; the State provided and the jury returned enhancement findings on each enhancement sought; the defendant did not object to the enhancement forms at trial; and the State requested the firearm enhancements be applied to each count at sentencing; and the trial court imposed them accordingly. We find the State satisfied the requirement set forth in *Apprendi* and the trial court did not err in imposing the enhancements.

¶ 102    Furthermore, even assuming the State did not meet this requirement or the trial court erred in imposing multiple enhancements, we would not find prejudice to the defendant where harmless-error review applies to *Apprendi* violations. *People v. Walker*, 2015 IL App (1st) 130500, ¶ 27. An *Apprendi* error is harmless when it is clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error. *Id.* More specifically, the failure to instruct the jury on an element is harmless when the evidence in support of the omitted element is uncontested and overwhelming. *Id.* Accordingly, we find the defendant's reliance on *People v. Edgecombe*, 2011 IL App (1st) 092690, misplaced. The defendant relies on *Edgecombe* for the proposition that where the State fails to submit separate instructions and verdict forms for each enhancement it seeks, any enhancement imposed without a separate jury finding must be vacated. *Id.* ¶¶ 4-5, 25-27. However, the *Walker* court recognized that that the court in *Edgecombe* did not address the application of harmless-error analysis to violations under *Apprendi*. *Walker*, 2015 IL App (1st) 130500, ¶ 29. Here, the jury did find that the defendant personally discharged a firearm during the commission of attempted first degree murder. Although a single enhancement verdict form was

40

used, the record reflects that the defendant repeatedly admitted to personally discharging his firearm during the offense. The evidence was uncontested and overwhelming in this respect and where accountability was established, the acts committed in furtherance of the crime are attributable to the defendant and the codefendants and applicable to the firearm enhancement. See *People v. Gipson*, 2015 IL App (1st) 122451 (finding that the personal discharge enhancement under attempted murder unambiguously requires an accountable defendant to have personally discharged his firearm but does not require that he personally discharged his firearm at the victim or injured the victim). Given the overwhelming and undisputed evidence that the defendant discharged a firearm, there is no reasonable probability the jury would have declined to find the enhancement applicable to each count had individual forms been used. Accordingly, based on the foregoing reasons, we find that the defendant's claim of ineffective assistance of sentencing counsel fails.

¶ 103                                 E. *Defendant's Sentence*

¶ 104   We next turn to the defendant's argument that his sentence should be reduced pursuant to section 5-8-4(f)(2) of the Code, controlling the aggregate maximum of consecutive sentences. This issue involves the proper application of different subsections of section 5-8-4 of the Code, the first of which requires the imposition of consecutive sentences for specified offenses. 730 ILCS 5/5-8-4(d) (West 2020). The defendant acknowledges that all seven Class X felony convictions for attempted murder were mandatory consecutive due to the infliction of severe bodily injury to the victims. The defendant agrees that under this section of the Code, his mandatory minimum sentence was 182 years with the firearm enhancements applied.

¶ 105   However, under the second relevant subsection, section 5-8-4(f)(2), which provides for a "cap" on the aggregate length of consecutive sentences under certain circumstances, he argues the

maximum sentence available to the trial court was 120 years, or 160 years if the firearm enhancements were also applied.

¶ 106    The relevant portion of subsection (f)(2) is as follows:

"For sentences imposed under the law in effect on or after February 1, 1978, the aggregate of consecutive sentences for offenses that were committed as part of a single course of conduct during which there was no substantial change in the nature of the criminal objective shall not exceed *the sum of the maximum terms authorized under Article 4.5 of Chapter v for the 2 most serious felonies involved*, but no such limitation shall apply for offenses that were not committed as part of a single course of conduct during which there was no substantial change in the nature of the criminal objective. ***" (Emphasis added.) *Id.* § 5-8-4(f)(2).

¶ 107    Article 4.5 of chapter V of the Code pertains to general sentencing provisions for offenses. Sections 5-4.5-25 of the Code defines the sentencing term for a Class X felony as follows: "The sentence of imprisonment shall be a determinate sentence of not less than 6 years and not more than 30 years. The sentence of imprisonment for an extended term Class X felony *** shall be not less than 30 years not more than 60 years." *Id.* § 5-4.5-25. This section of the Code does not refer to firearm enhancements, and the defendant argues the enhancements should not be used in calculating the aggregate maximum consecutive sentence. Therefore, the defendant argues that the sum of the maximum terms authorized for the two most serious felonies involved in this case, two Class X offenses, is 120 years, and the 182-year aggregate sentence exceeds this limit.

¶ 108    The determination of whether a defendant's actions constituted a single course of conduct or were part of an unrelated course of conduct for the purposes of section 5-8-4(f)(2) is a question of fact for the trial court to determine. *People v. Robinson*, 2015 IL App (1st) 130837, ¶ 102. In

42

the instant case, the trial court did not make an express finding as to whether defendant's actions constituted a single course of conduct for purposes of section 5-8-4(f)(2). Although the issue was raised by the State and the trial court considered it at sentencing, there is no express finding in the record. Instead, the trial court only found that "720 ILCS 5/8-4 with the enhancement applies to this case." However, on appeal, neither party disputes that section 5-8-4(f)(2) applies. The parties only dispute the correct calculation of the defendant's aggregate maximum sentence. Because neither party disputes the application of section 5-8-4(f)(2) and we conclude that a finding that defendant's actions were not part of single course of conduct would be against the manifest weight of the evidence, we address the issue. See *People v. Thompson*, 2022 IL App (2d) 190950-U, ¶ 41.[3]

¶ 109    Illinois courts have calculated the maximum aggregate sentence using the maximum extended-term sentence for the class of felony committed. See *People v. Pullen*, 192 Ill. 2d 36, 46 (2000); *People v. Woods*, 131 Ill. App. 3d 51, 55 (1985); *People v. Beck*, 190 Ill. App. 3d 748, 763 (1989); *People v. Myrieckes*, 315 Ill. App. 3d 478, 482 (2000). The maximum permissible sentence was 120 years—the sum of the maximum permissible extended-term sentences for two Class X offenses. *Pullen*, 192 Ill. 2d at 42. When a trial court imposes consecutive sentences for multiple Class X felonies based on a single course of conduct, pursuant to section 5-8-4(f)(2), the maximum total sentence is 60 years plus 60 years: 120 years. *Myrieckes*, 315 Ill. App. 3d at 482.

¶ 110    Here, it is apparent from the law in Illinois that the defendant's aggregate maximum sentence for the two most serious Class X felonies is 120 years. However, our research did not reveal any Illinois cases that addressed the question of whether mandatory firearm enhancements should be applied in calculating a defendant's aggregate maximum sentence or whether the

---

[3]Nonprecedential Rule 23 orders issued on or after January 1, 2021, may be cited for persuasive purposes. Ill. S. Ct. R. 23(e)(1) (eff. Feb. 1, 2023).

enhancements should strictly apply to the defendant's actual sentence. Based on our interpretation of section 5-8-4(f)(2), the case law, and the distinct silence as to firearm enhancements in article 4.5, chapter 5 of the Code, we decline to apply the enhancements for the purposes of calculating the defendant's aggregate maximum sentence and find 120 years to be the defendant's aggregate maximum sentence. Consequently, we honor the statutory cap on consecutive sentences. Pursuant to Rule 615(b)(4), a reviewing court may "reduce the punishment imposed by the trial court." Ill. S. Ct. R. 615(b)(4) (eff. Jan. 1, 1967). Depending on the circumstances of the case, we can impose a new sentence or remand the matter for resentencing. *People v. Jones*, 168 Ill. 2d 367, 378 (1995). Here, we find it more appropriate to impose a new sentence rather than exhaust additional judicial resources that would be expended by ordering a new sentencing hearing. *People v. Saldivar*, 113 Ill. 2d 256, 268 (1986); *People v. O'Neal*, 125 Ill. 2d 291, 300 (1988). As previously stated, the trial court imposed the minimum sentence of 182 years after applying the mandatory consecutive sentences and mandatory firearm enhancements to the defendant's sentence. When a defendant receives consecutive sentences for multiple felonies, these sentences are treated as a single term, and the defendant serves the mandatory supervised release (MSR) term corresponding to the most serious offense. *People v. Jackson*, 231 Ill. 2d 223, 227 (2008). Therefore, pursuant to our authority under Illinois Supreme Court Rule 615(b)(4) (eff. Jan. 1, 1967), we reduce the defendant's aggregate sentence on the seven attempted murder charges and any convictions running concurrent to 120 years' imprisonment, followed by 3 years of MSR, to comply with the statutory cap on consecutive sentences.

¶ 111                                III. CONCLUSION

¶ 112   For the foregoing reasons, we affirm the defendant's convictions and reduce his sentence to 120 years' imprisonment, followed by 3 years' MSR to comply with the statutory cap on

aggregate maximum consecutive sentences pursuant to section 5-8-4(f)(2) of the Code (730 ILCS 5/5-8-4(f)(2) (West 2020)).

¶ 113   Affirmed; sentence modified.